VICTOR MONROE CUSHWA ᴇᴛ ᴀʟ. *vs.* THE BUR-
GESS AND COMMISSIONERS OF WILLIAMS-
PORT.

*Dedication to public*: *acceptance; provision of Court and jury;*
*abandonment; no presumptive title against*
*municipality.*

For there to be a dedication to the public it is not necessary
that a municipal corporation be in existence at the time;
but when the corporation comes into existence, whether by
incorporation or by the extension of corporate limits, the
right to take advantage of the dedication on behalf of the
public will vest, provided the dedication has not been pre-
viously revoked.                                    p. 311

While it is for the jury to pass upon the facts involved in
questions of dedication and acceptance, yet it is for the Court
to determine what facts constitute such dedication and
acceptance.                                    pp. 312-313

Where it does not appear by the record that objection to a
prayer was made below on the ground that it submitted to
the jury a question of law, such prayer will not be deemed
defective on that ground by the Court of Appeals.    p. 314

Where under the Act of 1786, Ch. 11, commissioners laid out a town with a map or plat thereof, on which streets, alleys and lots were marked which was duly recorded, with a large public square marked out, and the town was subsequently incorporated and laid out along the same lines; and in the memory of the oldest inhabitants there had always been roads through the said square and it·had always been used by the public in various ways, as for horses, team, etc. etc., it was *held* sufficient proof of acceptance of dedication to the public.                                        pp. 315-317

There is no title by prescription against a municipal corporation; and from the mere fact of long continued and uninterrupted· occupation by individuals of lands formerly dedicated to the public, there is no presumption of abandonment by the municipality.                                        p. 319

*Decided January 11th, 1912.*

Appeal from the Circuit Court for Washington County (KEEDY and HENDERSON, JJ.).

*The following is a reproduction of the portion of the plat referred to in the opinion of the Court.*

STREET 80'

96'

4

3

2

1

66

66

66

COM

196'

321.75'

SPRING

STABLE

STABLE

TOLL HOUSE

TOOL HOUSE

R R

MARYLAND

BRIDGE CO. R.O.W.

A2

E BRIDGE

WESTERN

WAREHOUSE 66'

COAL SHED

W. M. R. R. SPUR

WEST

PIER I

W. M. R. R.

ENGINE HOUSE

241

66'

BASIN

CANAL

240

PIER 2

CAN

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON, URNER and STOCK-BRIDGE, JJ.

*Charles D. Wagaman* and *Wm. J. Witzenbacher,* for the appellant.

*A. C. Strite* and *C. A. Little,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The Burgess and Commissioners of Williamsport sued V. Monroe Cushwa and others for trespassing on what is alleged to be a public square in that town. There are seven bills of exception in the record—the first was waived, the second, third, fourth, fifth and sixth relate to rulings on the admissibility of evidence and the seventh presents the rulings on the prayers. The plaintiff offered three prayers, the first and third of which were granted and the second rejected, and the defendants offered five, the third and fourth of which were granted with some modifications and the others were rejected. We will first consider the rulings on the prayers.

By Chapter 11 of the Acts of 1786 the Legislature of Maryland appointed five commissioners to survey a quantity of land not exceeding 150 acres contiguous to the mouth of Conococheague Creek which empties into the Potomac River, who were directed to lay out the land into lots, streets, lanes and alleys, to be erected into a town to be called and known by the name of Williamsport, and to return a correct and accurate plat and certificate thereof to the Clerk of Washington County Court, who was required to record the same among the Land Records of the county and to keep the original in his office. It was provided that a copy of the original, or the record thereof, should be conclusive evidence of the bounds and lines of the lots of the said town and of the streets, lanes and alleys thereof. On May 18, 1787, the commissioners filed a plat, with explanatory notes, of eighty-

two .acres of land so laid out by them, there being 241 lots and a number of streets and alleys.

There are four streets which run east and west and are eighty feet wide, three which run north and south and are sixty-six feet wide, and one called Commerce street which runs "S. 30 degrees East, or nearly so," and is seventy-eight feet wide. There is also mentioned in the explanatory notes what is called Water street and the notes state that it "runs N. and S. or nearly so," and is 87 feet and 9 inches wide. That is not named on the plat, but there is a space between lots 223 and 224, running from the north boundary of the town to Potomac street, which was probably intended as Water street. There is also a space on the plat which is 321 feet and 9 inches from east to west, and about 198 feet from north to south. Lot No. 241 is on the west side of that space and fronts on Potomac street, and lots Nos. 2, 3 and 4 front on the space on the east side thereof. The explanatory notes thus speak of it: "From lot No. 241 to lots Nos. 2, 3 and 4 is 231 feet and 9 inches, laid off for a public square, bounded by Potomac street on the north and on the south by the first line of the town and the end of Commerce street." That public square is the subject of controversy in this case. We will request the reporter to publish with the report of the case enough of the plat to show how that square is formed by the contiguous lots and streets, as that will make our description of it more intelligible, but it is sufficient to add here that the plat and explanatory notes on it show beyond question that at the time Williamsport was laid out as a town a public square which was well defined was provided for. Within one year after the plat was recorded, to wit, on April 10th, 1788, Otho Holland Williams, the owner of the land which had been so laid out, made a lease to Matthew Van Lear and William Van Lear in which he recited the Act of 1778, and that the commissioners had surveyed and laid off parts of the tracts mentioned into lots, streets, lanes and alleys, and had returned "a correct and accurate certificate and plat thereof to the Clerk of Washington County

Court agreeable to the direction of the said act, as by the Land Records of the said county reference being thereto had will more fully appear." By it he leased to them "all that lot or portion of ground in the town of Williamsport surveyed and laid off by the commissioners aforesaid by the authority in them vested by the Act of Assembly above recited, known and distinguished on the plat of said town by number four, lying and being on the southeast corner of Potomac street and the Public Square, being a corner lot and bounding sixty-six feet on the Public Square and ninety-six feet on Potomac street." That lease required the lessees to erect on the lot before the 1st day of May, 1792, "a house of brick or stone, frame or hewn logs at least twenty feet by twenty-six feet," and the indications are that the house then built is still there and now known as part of the Miller property.

Without deeming it necessary to cite authorities to support the statement, or now refer to other evidence on the subject we can have no doubt that there was a dedication of this public square, which was well defined and sufficiently described. In order that there be a dedication, it is not necessary that a municipal corporation be then in existence, and when it comes into existence, whether by incorporation or extending the corporate limits the right to take advantage of the dedication on behalf of the public will vest therein if the dedication have not been previously revoked. 3 *Dillon on Mun. Cor.* (5th ed.), sec. 1086. It becomes immaterial therefore to discuss the question whether the Act of 1786 created a municipal corporation or whether Williamsport first became such by Chapter 125 of the Acts of 1823, when the first regular charter was granted.

We will presently consider the question whether there was an acceptance by the public and the appellee, but assuming for the present that there was, in order that the meaning of the prayers of the respective parties may be better understood, we will here add that the testimony shows that a stable, shed and perhaps other small buildings were erected

upon the square, by parties under whom the appellants claim, fifty or more years ago, and that they are still maintained by the defendants, and they and those under whom they claim have also made other uses of parts of this square for many years. The Chesapeake and Ohio Canal Company has occupied a small corner of it since the canal was built, there are several tracks of the Western Maryland Railroad Company which have been on it since 1873, and more recently a part of it has been occupied by the bridge of the Washington and Berkeley Bridge Co.

The first prayer of the plaintiff, which was granted, instructed the jury that if they found that the town of Williamsport was laid out under the provisions of Chapter 11 of the Acts of 1786, that a plat was made with the descriptions thereto attached, and the plat, description and certificate of commissioners were recorded, and that in said plat a piece of land was laid off as and for a public square for the use of the public, "and that the same was described and the dimensions thereof set forth in the description and explanation of said plat and that the same was dedicated to the use of the public and accepted by the same," and further find that the defendants erected and maintained and continue to maintain buildings thereon, for their own private use, and used and continue to use a part of said public square for the storage of coal, then the plaintiff was entitled to recover, even though the jurors found that such user by the defendants continued for more than twenty years, provided they further found that the plaintiff had not abandoned the same prior to, or during the period of such user.

It will be observed that that prayer submitted the questions of dedication and acceptance to the jury. It was for that reason technically erroneous. It is true that there are authorities which state the proposition broadly, that whether there has been a dedication or acceptance is a question for the jury, but we understand the law of this State to be that while the jury passes upon the facts involved in the ques-

tion whether there was a dedication or acceptance, it is for
the Court to determine what constitutes such dedication
or acceptance. In *Maenner* v. *Carroll*, 46 Md. 225, the
Court through JUDGE ALVEY said, "The Court was correct
in rejecting the sixth prayer of the plaintiff not only for
the reason just stated, but because that prayer failed to define
what would constitute a legal dedication of a way to public
use. The jury were not the tribunal to determine that
question. They were competent to find the existence of facts
to fulfil the definition, but not to determine the definition
itself." In *Kennedy* v. *Cumberland*, 65 Md. 514, JUDGE
MILLER said, "The Court below in its rulings upon the
prayers instructed the jury what facts it was necessary for
them to find in order to entitle the plaintiffs to recover. In
other words, the Court treated the question of acceptance
of the street by the city as a question of law, and in this
we find no error. This point has not hitherto been directly
presented to this Court, but the ruling is sustained by our
decisions in numerous analagous cases which it is unneces-
sary to cite." Then after referring to *Falsom* v. *Town of
Underhill*, 36 Vt. 580, where it was held that if the facts
were undisputed the acceptance *vel non* of a street by a city
is a question of law, in speaking of cases where the facts are
disputed the opinion went on to say, "The Court in such
cases leaves the finding of the facts to the jury with appro-
priate instructions as to their legal effect, according as the
jury may find them to be. And there is good reason why
this rule should be applied in cases like the present for if
the question of acceptance or adoption *vel non* should be left
broadly to the finding of the jury, it would follow that the
liability of a county or municipality would be left in uncer-
tainty, depending upon the varying verdicts of different
juries upon the same state of facts, instead of being, as it
should be, settled and fixed by the law as declared by the
Courts." See also 13 *Cyc.* 485-6; 9 *Am. & Eng. Ency. of
Law*, 52-53.

But while that is the law of 'this State, the appellant cannot now complain of the error in the prayer because section 9 of Article 5 of the Code says, "No instruction actually given shall be deemed to be defective by reason of any assumption therein of any fact by the said Court, or because of a question of law having been thereby submitted to the jury, unless it appears from the record that an objection thereto for such defect was taken at the trial." No objection does appear from the record to have been made because a question of law was submitted to the jury, and hence that error cannot be corrected by us, although owing to the conclusion we have reached as to the fact of dedication and acceptance it is perhaps immaterial.

There was, however, a special exception to that prayer on the ground that there was no evidence "legally sufficient to show that there was any acceptance of the offer to dedicate the square as laid out on behalf of the public," and the defendants' first and second prayers asked the Court to say that there was no evidence legally sufficient to entitle the plaintiff to recover—the first referring to the pleadings and the second not doing so. It becomes necessary, therefore, for us to determine whether there was legally sufficient evidence to show an acceptance.

We have reached the conclusion that that must be determined in the affirmative. It is true that the evidence tends to show that very little use has been made by the public of this square outside of the roadway over it, but as we have seen the plat of the town authorized by the legislature was put on record in 1787, and the first charter of the town was granted in 1823, when that plat was on record. There is no description of the limits of the town in the Act of 1823, but those limits and the streets, alleys and this public square were distinctly shown on the plat. In *Kennedy* v. *Cumberland,* 65 Md. 522, in speaking of an amendment to the charter as affecting Shriver's Addition to Cumberland, the Court said, "If the amended charter had, for the first time, brought

the land so platted within the city limits, and it had been accepted by the city, a different question would have been presented. In that case there would have been some ground for contending that the acceptance of the amended charter operated as an acceptance or adoption of the streets so laid out and dedicated to the public by the owners." It would seem that when the legislature had previously authorized a plat to be made for a town, and with that plat on record had incorporated the town, there would be still stronger ground for such contention, and in the absence of some positive act on the part of the municipality declining to accept the streets, alleys and public square laid out on the plat and dedicated to the public (if indeed it could do so without the consent of the legislature), it might well be presumed that it had accepted them, without any further facts being shown.

But the testimony of some of the oldest residents of Williamsport shows acts, the effect of which it would be difficult to escape from. Mr. Mclown, who was 87 years of age, testified that he had known this square all his life, and described its bounds in a way very similar to that given on the plat. He said that "It was used like a commons in 1854; that the boatmen would run their boats in the basin and stand their mules there; they would run into port, unhook from the boats, put their troughs on the square, and tied their horses there." He also said: "There was much traffic by wagons to Williamsport and to the warehouse; that the wagons would generally come down Potomac street and return by Commerce street to Salsbury, so as to avoid the steep hill on Potomac, and do it yet; that there was a great trade with wagons before the railroad came; that the traffic on Potomac street and Commerce street was about equally divided; that it passed from Potomac street along the roadway on the square into Commerce street; that the corporation maintained this roadway, and threw mud and slate upon it." Another witness who was 78 years of age said, "that before buildings were there the square was a public thoroughfare, anybody could use it as they pleased; that he saw horses,

mules and anything but stables put on there until of late years; some wagons put on there; some people on there." Other witnesses testified to the same effect and it was shown that the corporation had planted out a row of trees on the east side two of which are still standing.

Of course it was impossible to obtain witnesses, whose recollections went back to the date of the filing of the plat or of the first charter, and it would be difficult to prove the circumstances under which the stable and shed claimed by the defendants were built, as well as difficult, if not impossible, to explain just what occurred when the canal was built, in 1833 or 1834. But the uncontradicted evidence is that there has been a roadway over the square from Commerce street to Potomac street as long as the oldest witnesses can remember. That has been maintained, drained and cared for by the appellee. There was nothing on the plat or in the evidence to show that the square was dedicated for any particular purpose, but the plat shows enough to make it certain that it was expected and intended that the square could be used to pass over it. Commerce street, according to the plat and the explanatory notes, stopped at the square, Potomac street bounded it on the north, and the space which we have described above as probably being Water street ends at Potomac street, above the northwest corner of the square, while Commerce street ends at the southeast corner. It could not therefore be contended that when the square was laid out it was not intended to have a roadway or roadways over it, but the location of them and other public user of the square were apparently left to the discretion of the town. The appellee certainly accepted so much of the square as has been occupied by the roadway as long as the oldest witnesses could remember, and there can be no presumption that it only accepted the part. So far as the record discloses, the appellee and the public made such uses of it as they saw proper, and while the testimony does not show much use of any other than the part occupied by the roadway, there is

sufficient to raise the presumption that the dedication of all the square was accepted.

This is not like *Kennedy* v. *Cumberland,* where the Court said that because the city accepted some streets it did not follow that all on the plat were accepted. If a municipality actually only use a third or a half of the width of a street, it could hardly be contended that it had only accepted such third or half. See 3 *Dillon on Mun. Cor.* (5th ed.), sec. 1088. This roadway runs diagonally across the square, and apparently was used as was most convenient to the public. So without referring to other testimony on this branch of the case, we think there was legally sufficient evidence of the acceptance, and hence the special exception to the plaintiff's first prayer was properly overruled and the defendants' first and second prayers were properly rejected—the theory of both sides in the lower Court being that that was a question for the jury.

As the plaintiff only received a verdict for one cent, it is not necessary to refer to its third prayer which related to the measure of damages. By the proviso in the plaintiff's first prayer and the defendants' third and fourth prayers the Court left the question of abandonment to the jury and the defendants can not complain of the Court doing what they asked it to do. The modification of the defendants' third and fourth prayers did not injure them as it lessened the burden they assumed in those prayers.

The defendants' fifth prayer sought to have the jury instructed that if they found the facts therein mentioned "then the jury is instructed that the plaintiff had abandoned said portion of said square and is estopped from asserting any claim thereto, and the verdict of the jury should be for the defendants." In other words the defendants asked the Court to say that there was an equitable estoppel which precluded recovery under the principles announced in *Baldwin* v. *Trimble,* 85 Md. 396. It is said in that case that: "Whilst an *encroachment* on a highway is conclusively settled in Maryland to be a public nuisance which can never grow by

presumption into a private right (*P. W. & B. R. R. Co.* v.
*State,* 20 Md. 157; *N. C. Ry. Co.* v. *Mayor, Etc., Balto.,* 21
Md. 93; *Ulman* v. *Chas. St. Av. Co.,* 83 Md. 130), yet it
may be true and in perfect harmony and accord with that
doctrine that cases, concerning . public streets can arise of
such a character, and founded upon an actual and notorious
*abandonment* of the highway by the public, that justice
requires, that an equitable estoppel shall be asserted even
against the public in favor of individuals." .

But in that case the appellant had acquired the interest in
the property subject to an easement in the public to have a
road over part of it, and the Court said: "There is no evi-
dence that this road was ever laid out by the municipal
authorities, or that it was ever accepted by them or kept in
repair at the public expense." It was also said that the
easement had been abandoned, and "that the title of the
appellant to the road does not depend on prescription as
against the public, but upon his deeds *and* the fact of an
abandonment of the public easement whereby the rights of
the public over the road were extinguished." The abandon-
ment by the public of the easement had induced innocent
parties to expend money on the property. The Court said:
"If ever there was a case where the doctrines of equitable
estopped ought to prevail against the public it certainly is
the case at bar, and we accordingly hold—not that the appel-
lant has acquired by prescription a right to that part of
Lanvale road between his two lots, but that having title
thereto under his deeds subject to an easement in the public
and the easement having been abandoned, so that the public
are equitably estopped to reclaim it, his title to the parcels
of the road claimed by him is merchantable."

By reference to that opinion it will be seen that there is
a manifest distinction between that case and the one under
consideration. There is no pretense here that the defendants
or those under whom they claim ever had a deed for any
part of this square from the original owner or any one claim-
ing under him. They were not induced to expend money on

the property by the action of the appellee, but they in effect claim by prescription under the name of equitable estoppel. In other words, they contend that what they and those under whom they claim did, together with what the Canal Company, the Railroad Company and the Bridge Company did, is conclusive evidence of an abandonment, and there being such an abandonment the appellee is equitably estopped. There is certainly no legally sufficient evidence that the appellee had abandoned the property when those under whom they claim took possession, or that those persons had any title to the part of the square in controversy, subject to an easement in the public, when they went into the possession, and if the appellants have any title now, it is because the unauthorized possession of those under whom they claim has ripened into a title by prescription, which in this State can not be as against a municipal corporation.

For aught that appears in the record the Canal Company may have condemned what it has, the Railroad Company may have legally acquired its right to possession by condemnation or in some other authorized way, and the Bridge Company may have been authorized by the appellee to take possession of what it has. There is some testimony from which it might be inferred that the Railroad Company and the Bridge Company did negotiate with the appellee, and furthermore that Mr. Victor Cushwa, under whom the appellants immediately claim, was a party to the negotiations. There is nothing to show that the Canal Company did not lawfully acquire the right to possession. The references to those companies under the circumstances made the prayer technically bad, as the jury could not have known from the record by what authority they went into possession. There are some other technical defects in the prayer, but regardless of them we do not think this is a case for the application of the doctrine of an equitable estoppel. The jury in fact found that there was no abandonment, and it could not have found for the plaintiff unless it had.

We will not discuss the rulings on the exceptions to the testimony, but will only add that we see no reversible error in them. Such being our conclusion on the several exceptions, we must affirm the judgment.

> *Judgment affirmed, the appellants to pay the costs.*