MAYOR AND CITY COUNCIL OF BALTIMORE *v.*
CHESAPEAKE MARINE RAILWAY CO., ET AL.

[No. 68, September Term, 1963.]

560

*Decided March 3, 1964.*

The cause was argued on October 17, 1963 before HENDER-SON, HAMMOND, HORNEY, MARBURY and SYBERT, JJ.

The cause was reargued on February 3, 1964 before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY, MAR-BURY and SYBERT, JJ.

Argued and reargued by *Clayton A. Dietrich, Chief Assistant City Solicitor,* with whom were *Joseph Allen, City Solicitor, George W. Baker, Jr., Deputy City Solicitor,* and *Harold E. Leo, Assistant City Solicitor,* on the brief, for appellant.

Argued by *Walter C. Mylander, Jr.,* and *Thomas A. Garland,* with whom was *Charles C. W. Atwater* on the brief for appellees.

Reargued by *Walter C. Mylander, Jr.,* and *Charles C. W. Atwater* for appellees.

HAMMOND, J., delivered the opinion of the Court.

The Mayor and City Council of Baltimore in 1957 filed an action on the case against the Chesapeake Marine Railway Company (which before trial in 1963 had been dissolved and had its assets distributed to its four owners who were substituted as defendants) for the obstruction of a way in Baltimore and for an injunction against the maintenance of a fence across the entrance of the way and the use thereof for private purposes on the claim that it owned an easement in the way for the public benefit and, therefore, the way was a public street.

The case was tried, after removal, in the Circuit Court for Baltimore County on the issues of whether there had been an effective dedication and, if so, whether the City was estopped to claim present ownership of an easement in the street.

In 1782 various owners of land in the area abutting on and adjacent to what is now Key Highway, running along the south inner habor basin of Baltimore, petitioned the Maryland Legislature to annex their holdings to the town of Baltimore. The Legislature responded by passing Ch. VIII of the Laws of 1782 (session beginning November 4, 1782, and ending January 15, 1783). The act set forth the names of the petitioners, and of their holdings, including Christopher Hughes (who was the owner of a tract called "Gist's Inspection" contiguous to Baltimore-town), and said that the various tracts were "well calculated for the purposes of commerce and navigation" and that it would be for the benefit and advantage of the town and its trade "in case the said tracts * * * were laid out into convenient streets, lanes and alleys" and authorized the commissioners of the town to cause the tracts by September the first next to be surveyed and laid out "into lots, streets, lanes and alleys" at the owners' cost. Section III of the act directed the

commissioners then to cause a "plot" of the lots, streets, lanes and alleys to be prepared and said that "said plot shall be recorded amongst the records of said town, as soon as conveniently may be thereafter." It then provided that said streets, lanes and alleys so laid out and plotted "shall be highways, and be so deemed and taken to all intents and purposes whatsoever" as part of Baltimore-town. Section IV of the act directed the commissioners to "cause their proceedings to be recorded amongst the records of said town, there to remain as evidence of the boundaries, situation and location of said lots, and of the streets, lanes and alleys aforesaid." [1]

The commissioners of Baltimore-town followed the directions of the Act of 1782 and, after a survey, a plat was prepared which showed a number of streets, including Leonard Street (which thereafter became Covington Street) which ran north across what was then Hughes Street (later and now Key Highway) to the edge of the water of the harbor. The plat contained this legend over the hands and seals of a majority of the commissioners of Baltimore-town. "The platt hereto annexed examined approved and passed by us the subscribers Commissioners of Baltimore Town pursuant to the Act of Assembly in that case provided [the Act of 1782]." The plat so signed and sealed was recorded among the records of Baltimore-town and long has reposed in the Bureau of Archives in the City Hall in Baltimore, to be found in Atlas 1 as Plat 11.

We think it clear that the Legislature's directions as to how Baltimore was to accept the offers of dedication of the individual owners transmitted by the Act of 1782 were complied with and that the offer was accepted and Leonard Street (hereafter to be called Covington Street) became a public street. In *Cushwa v. Williamsport,* 117 Md. 306, 315, the Court said:

---

1. In 1729 the Assembly of Maryland by Ch. XII of the laws of that year passed an act for the erecting of a town on the north side of the Patapsco in Baltimore County. The act named seven individuals as commissioners of the town, to "be called by the Name of Baltemore Town" and authorized them to lay out a designated tract of land into sixty lots. The town was enlarged by subsequent acts before it became a chartered city in 1796.

"It would seem that when the legislature had previously authorized a plat to be made for a town, and with that plat on record had incorporated the town, there would be still stronger ground for such contention [an acceptance of an offer of dedication], and in the absence of some positive act on the part of the municipality declining to accept the streets, alleys and public square laid out on the plat and dedicated to the public (if indeed it could do so without the consent of the legislature), it might well be presumed that it had accepted them, without any further facts being shown."

Here the express acceptance by the town in the manner directed by the Legislature is a matter of record and makes solid the presumption referred to in *Cushwa*. There is nothing to indicate any declination by the City of the streets shown on the plat.

We turn to consideration of the matter of estoppel. The record offers no direct showing of what occurred on and in relation to Covington Street from 1783 when it became a public street until about 1900. The title records reveal that in 1825, following the death in 1824 of Christopher Hughes, who had continued to own the bed of Covington Street, subject to the easement for public use as a street, and the land on both sides of the street, there was a partition proceedings in the High Court of Chancery by which Hughes' real property was divided among his children. One child was given a lot on the east side of Covington Street—one hundred feet on Hughes Street with a depth northerly binding on Covington Street of two hundred twenty-eight feet—and another child received a lot on the west side of Covington Street—with sixty-four feet frontage on Hughes Street and a depth of two hundred sixty-five feet binding on Covington Street. Title to the bed of the street remained in the six children of Christopher Hughes as tenants in common and the street thus was recognized as a street in the judicial proceedings.[2] Thereafter all conveyances of the lots

2. Although the record owners of the fee in the bed of Coving-

on the east and west sides of Covington Street followed the partition proceeding description and called for them to bind on Covington Street until 1955, when the appellees caused to be prepared a self-serving straw deed which claimed title to the bed of the street.

During the nineteenth century various plats and maps showed Covington Street as extending north to the water's edge. These included the Warner and Hanna Map of 1801, the Samuel Green Survey of 1807, and Sanhorn's Atlas of 1887 (this also showed a pipe under the street). *McCreary's Street Index,* described as an authoritative index covering the opening, closing, widening and naming of streets from 1732 to 1900 and which was used by the Bureau of Surveys in renaming streets in 1927, showed Covington Street as continuing north to the water and gave as one of its authorities a reference to Atlas 1, Plat 11, where the 1783 Plat was recorded in the Bureau of Archives of Baltimore. City Directories, up to 1900, described Covington Street as going to the water's edge. Newspapers referred to the shipyard at the foot of Covington Street.

In 1911 the ordinance (No. 682) for the condemnation of a right of way for Key Highway recognized the part of Covington Street in dispute.

In 1914 when one of the Reeders sold the property on the east side of the part of Covington Street now in dispute, the grantor and her attorney wanted to incorporate a statement or agreement that Covington Street was a private street and was not intended to be dedicated by the deed, and the City would not agree or accept a deed so stating.

When the City leased a pier adjoining Covington Street to

ton Street (the heirs of Christopher Hughes) were not parties to the suit and the title of the appellees was not at issue except as against the Mayor and City Council of Baltimore, Judge Turnbull, below, found that the appellees had a prescriptive title in fee as against the heirs of Christopher Hughes. The record before us is indecisive as to the relationship between the heirs of Christopher Hughes and the appellees and as to whether the use the predecessors in title of the appellees made of Covington Street was permitted by the heirs or was adverse, and as to whether such use otherwise gratified the various requirements of obtention of title by adverse possession.

a man in the junk business named Jording (by lease which ran from 1920 to 1934), the calls recognized Covington Street as a public highway. The street was recognized as such in 1938 by a tax assessment plat of the City and in 1941 by a storm drain plat. The property disposition records of the Commission on Efficiency and Economy from 1927 to 1955 showed Covington Street as extending to the harbor.

The testimony of C. Howard Reeder was that property on both sides of Covington Street had been owned by his grandfather and his father since the early nineteenth century. The street was never paved or curbed (although when Key Highway was built turn-in curbs at its intersection with Covington Street were installed). Mr. Reeder's personal knowledge of the street began in 1903. It was used by his family's marine railway business (which later became the Chesapeake Marine Railway Company) for the storage of lumber and the construction of barges and one tugboat. Mr. Reeder said that it was his understanding that the City had never accepted the offer of dedication of the street by Christopher Hughes but that his family had never claimed legal title to the street until 1955. A Mr. Luber, who worked for the marine railway company from 1909 to 1926, testified that six or seven barges had been built in the part of the street near the water in that period. Mr. Reeder's father raised a bulkhead at the water line two feet and filled in land to that extent.

The evidence of use of Covington Street in the twentieth century by others than the Reeders was that schooners from Maine unloaded ice there, which was transported over the street to the ice company to which it was consigned (The Main Lake Ice Company, later the Knickerbocker Ice Company, the address of which in the City Directories of the period was Hughes & Covington Streets), and children visited the waterfront, using the street, as did adult spectators who would walk down the street to view the harbor. Jording caused heavy junk to be hauled over the street to his yard. A small ferry, which took passengers to the other side of the harbor, operated from a nearby dock and substantial numbers of passengers regularly walked down the street to get to the ferry.

City records, made in the ordinary course of business, show that for some thirty years prior to 1952 (beginning in 1921) Chesapeake had paid the City a monthly rental of $25.00 for, according to the notation on the City record card, "rental of City Property" (which was described on the card as the bulkhead at the foot of Covington Street). The appellees claim that the rent was for use of the pier which the City had leased to Jording in 1920 (the year before the rental began) for fourteen years, and the trial court so found. The pier was destroyed by a storm in 1933. It is difficult to accept the finding below with its necessary implication that the City leased to Chesapeake and it accepted a pier already leased to another, and that Chesapeake was so inadvertent, as it claims, as to have continued to pay $25.00 a month from 1933 to 1952 for a nonexistent pier.

Further doubt is cast on the appellees' claim that the monthly rental was for the neighboring pier by testimony that in 1941, about the time of that year when the City had determined, according to its records, that it was necessary that a storm drain "be rebuilt in Key Highway and Covington Street," Mr. Harry Gilbert, a well known real estate owner, dealer and appraiser and a lawyer, had approached the City on behalf of Chesapeake in an effort to have Covington Street closed and transferred to Chesapeake. The appellees claim that Mr. Gilbert's agency was not established because Mr. Craig, a substituted defendant below and an appellee here, who was an officer of Chesapeake, said that he thought Gilbert had never represented Chesapeake because his father, who was then its president, would have told him if he had. He said also, however, that his father and Gilbert were intimate friends who regularly attended the same small church and saw each other frequently. The appellees themselves adduced testimony from one Simmons (who was in 1941 and at the time of the trial on the staff of the Director of Public Works of Baltimore assigned to the handling of special legal and engineering problems in order to make recommendations to the director) that he was a member of the Bar, that he knew Gilbert to be a member of the Bar, and that Gilbert came to talk to him about Covington Street in 1941 and said he was representing the Chesapeake Marine Railway Com-

pany in his capacity as attorney and his client wished to have Covington Street closed and transferred to it. Thereafter, Mr. Gilbert wrote a letter on April 4, 1941, on his stationery as attorney at law to the City Engineer, saying that Chesapeake "would like to purchase the bed of Covington Street which lies between the Key Highway and the water of the Patapsco River." The letter continued that Chesapeake owned the adjoining property to the west "and for a number of years past has been renting from the City the bed of this street which has never been either graded or paved."

Mr. Simmons testified that upon receipt of Gilbert's letter his department, as was the custom, checked to see if there were any utilities in the bed of the street and then, as the municipal law directs, submitted the proposal to the Commission on City Plan for approval or disapproval. The Commission wrote the Chief Engineer that the proposal for closing Covington Street had been considered at a regular meeting of the Commission and that "the Commission on City Plan disapproves the proposal to close this portion of Covington Street, or any part thereof, from the north building line of Key Highway to the pierhead line of the Harbor, because it is the opinion of the Commission that this street bed is essential to the City for municipal purposes." The Chief Engineer forwarded a copy of this letter to Mr. Gilbert with the statement that nothing further could be done to accomplish Gilbert's desires in the matter.

Several months later the City began to install a 24-inch concrete drain pipe in the bed of Covington Street to the water's edge, digging a deep trench in the process. The project took eight months to complete. Chesapeake made no protest whatsoever and no claim that the City did not have full right to install the drain.

Quiet prevailed thereafter for some ten years. Then Chesapeake's counsel, Mr. Walter Mylander, who represents the appellees on this appeal, advised it to discontinue the $25.00 a month rental and it did so. Mr. Mylander conferred with Mr. Lloyd McAllister, a most competent, experienced and reputable lawyer who was the Assistant City Solicitor in charge of real estate matters in the City Solicitor's office. Mr. McAllister sent

570

one of his eight assistants to investigate the matter and, on the basis of what he later termed a "skimpy" and "not extensive" investigation, concluded, in effect, in a letter to the Deputy Comptroller dated December 2, 1952 (with a copy to Mr. Mylander), that there had been an offer of dedication to public use but that "the physical use of the land within the street is in direct conflict of any intention to dedicate" and the street was private property. This conclusion, according to the letter, was largely the result of the investigator's interview with Mr. C. Howard Reeder.

In 1955 Mr. Mylander pressed the City for abatement of the monthly rental of $25.00, solicited the placing of the street on the tax rolls and the payment of three years back taxes (taxes were assessed for 1956 on the strength of the asserted record claim of title), put on record a straw deed which incorporated the letter of Mr. McAllister and enlarged the description of appellees' property to include Covington Street, and Chesapeake built a fence across the entrance to the street and built a wooden pier to replace its dilapidated, inadequate and dangerous floating dock at a cost of $12,000. Two-thirds of the width of the pier was opposite the foot of Covington Street and one-third opposite the foot of appellees' property on the west of Covington Street.

Bethlehem Steel Company had purchased the land east of Covington Street from the City by a deed of September 8, 1954, in which the City reserved all title to the bed of Covington Street. When Chesapeake put up the fence, Bethlehem protested to the City and demanded that Chesapeake be required to remove the fence and its material and equipment from the street and that the City take all necessary steps to establish the area as a public street. After a thorough investigation and mature consideration, Mr. McAllister became convinced that his conclusion of 1952 that Covington Street was private property had been erroneous. He wrote the Deputy Comptroller on July 27, 1956, in reference to his former letter of December 2, 1952, saying in part:

"The examination made by this office at that time on the status of the street was not very extensive, and

recently a more thorough investigation has been made in respect to the street status. Based upon this, it is now my opinion that the street is a public highway under the jurisdiction of the City of Baltimore. Furthermore, the City has a utility in the bed of the street which was installed by it several years ago within the 20-year limitation. There are other factors which have been discovered that will, in my judgment, firmly establish the fact that the street is public.

"I might add that the City is now in the course of preparing the necessary Court papers to have the Court confirm the City's position in respect to the status of the street."

In response to a question from the Bench as to what facts were before him in 1956 that were not in 1952, Mr. McAllister said that he had not had a complete record to consider in 1952 and then did not know of the Act of 1782, the Map (the plat) made by the commissioners under the authority of the Act of 1782, the details of the Hughes partition in 1825, and the fact of the installation of the storm drains.

Suit was filed by the City ten months after the second McAllister letter and came to trial six years later. Mr. McAllister said the delay was solely due to the frequent changes in personnel in the City Solicitor's office which resulted in only the most pressing and the "squeaking wheels" litigation being disposed of first.

In their brief and in oral argument counsel for the appellees agreed with counsel for the City that an essential basis of an estoppel against the City was a finding of an actual and notorious abandonment of the street which had continued for at least the period of statutory prescription. The appellees argued that there was evidence of such abandonment and the City contended the evidence was clearly to the contrary. At the reargument of the case the appellees urged that without regard to abandonment estoppel against the City could and should be predicated on the 1952 letter of Mr. McAllister, followed by the building of the fence and of the pier, each having been built after a permit therefor had been issued by the City.

We think that the law that governs the case is that which both sides originally conceived to be the law. It is firmly established that land held by a municipality in its governmental capacity (as opposed to a proprietary or business capacity) and therefore held in trust for the public cannot be disposed of without special statutory authority and may not be acquired privately by adverse possession, which does not run against the sovereign. *Messersmith v. Riverdale,* 223 Md. 323, 327-328; *Montgomery Co. v. Met. District,* 202 Md. 293, 303; *Town Commissioners of Centreville v. Queen Anne's County,* 199 Md. 652, 656.

In exceptional cases, where the Court found that right and justice demanded it, there has been recognition in Maryland that private ownership has been acquired of property held by a municipality in a governmental capacity (and so in trust for the public) where there has been actual and notorious abandonment of the property by the municipality for at least as long as the legal period of prescription which has induced action by the person claiming ownership, the results of which it would be unjust and inequitable to disturb.

In *Baldwin v. Trimble,* 85 Md. 396, the Court found that the owner in fee of the bed of part of Lanvale Street in Baltimore, subject to an easement of public use and travel owned by the City of Baltimore, had acquired the street free of the easement and had a merchantable title thereto. Lanvale Street had never been accepted and the Court found in fact that any claim to it had been abandoned by the City. For twenty-five years it had actually been largely closed physically by buildings constructed across it for almost all of its length and the small remaining part had been rendered impassable by the dumping of sand and earth thereon by the owers of the fee.

The Court held that in Maryland encroachment on a highway is a public nuisance "which can never grow by prescription into a private right" and then adopted the views of Judge Dillon set forth in 2 Dillon, *Mun. Corp.* (2nd Ed.), Sec. 433, that in cases of "actual and notorious *abandonment* of the highway by the public" justice may require that an equitable estoppel ought to be asserted against the public in favor of individuals. The Court further said (p. 403):

"In that event, such cases [of abandonment], as observed by Judge Dillon, 'will form a law unto themselves,' and will 'not fall within the legal operation of limitation enactments. * * * 'There is no danger,' he continues, 'in recognizing the principle of an *estoppel in pais* as applicable to such cases, as this leaves the Court to decide the question, not by the mere lapse of time, but by all the circumstances of the case, to hold the public estopped or not, as right and justice may require.' "

The Court concluded that the owner of the fee, subject to the easement, had a full and merchantable title because the easement had been obviously and notoriously abandoned and the street had been physically closed with the acquiescence of the City for so long a time that innocent parties had been led to assume it was no longer a highway and had made permanent improvements on it.

The theory of law advocated by Judge Dillon and adopted by the Court in the *Baldwin* case has been severely criticized and many courts have refused to follow it.

11 McQuillin, *Mun. Corp.,* Sec. 30.181, says:

"In many jurisdictions, including some of those where the rule prevails that title to streets cannot be acquired by third persons by adverse possession, such rule is largely nullified by holding that the doctrine of equitable estoppel may preclude the right of a municipality to remove an obstruction or assert title to the street. This rule of equitable estoppel is the well-settled law in Iowa, and is recognized and applied in many other jurisdictions. The rule is probably based to some extent at least on a statement of Judge Dillon, which, however, has been criticized, and some courts have refused to adopt the theory that the rule denying title by adverse possession can be thus evaded.

"While the doctrine of equitable estoppel is sometimes invoked in what are termed 'exceptional cases,' it is always applied, and wisely so, with much caution

to municipal corporations in matters pertaining to their governmental functions."

2 Elliott, *Roads and Streets,* Sec. 1189, asserts that unless the municipal authorities have affirmatively misled the claimant that abandonment based on non-user or the making of improvements cannot, on principle, sustain the application of the doctrine of equitable estoppel, saying (p. 1697) :

"It is difficult to conceive upon what principle an equitable estoppel can be securely placed in such cases, for the person who encroaches upon a public way must know, as a matter of law, that the way belongs to the public, and that the local authorities can neither directly nor indirectly alien the way, and that they can not divert it to a private use. As the person who uses the highway must possess this knowledge, and in legal contemplation does possess it, one of the chief elements of an estoppel is absent. An estoppel can not exist where the knowledge of both parties is equal and nothing is done by the one to mislead the other. In addition to this consideration may be noted another influential one already suggested in a different connection, and that is, the private use of the public way was wrong in the beginning and wrong each day of its continuance, and it is a strange perversion of principle to declare that one who bases his claim on an original and continued wrong may successfully appeal to equity to sanction and establish such a claim. It is, at all events, a great stretch of the doctrine of estoppel and a wide departure from the rule laid down by the earlier decisions and confirmed by many of the modern authorities."

In *Cushwa v. Williamsport,* 117 Md. 306, involving dedication of a square in the City, it was found that for over fifty years there had been on a part of the square a shed, a stable and other buildings built and used by strangers to the fee title to the square, and the C. & O. Canal Company had used and was using another small part, a railroad company another part,

and a bridge company still another. The Court found a manifest distinction between the *Baldwin* case and the case before it, saying (pp. 318-319):

> "There is no pretense here that the defendants or those under whom they claim ever had a deed for any part of this square from the original owner or any one claiming under him. They were not induced to expend money on the property by the action of the appellee, but they in effect claim by prescription under the name of equitable estoppel. In other words, they contend that what they and those under whom they claim did, [the building and use for fifty years of the shed, the stable and other buildings] together with what the Canal Company, the Railroad Company and the Bridge Company did, is conclusive evidence of an abandonment, and there being such an abandonment the appellee is equitably estopped."

The Court said that the mere fact of long-continued and uninterrupted occupation of dedicated municipal land gave rise to no necessary presumption of abandonment by the municipality and concluded that "we do not think this is a case for the application of the doctrine of an equitable estoppel" and the ultimate basis for this finding would seem to have been that there had been no abandonment.

In *M. & C. C. of Balto. v. Canton Co.*, 124 Md. 620, there was an offer of dedication of a street which the City, for the first time, attempted to accept sixty-seven years later. There had never been any public use of the street. For twenty-two years it had been fenced in and used for a private shipyard. For five years thereafter it lay idle within the fences. For the twelve years before the trial it had again been used as a shipyard. For the last thirty-eight years the City had assessed and collected taxes on the property. On the strength of the *Baldwin* case the Court found the City estopped from presently "accepting the assumed dedication" (p. 634).

In *Finance Corp. v. Realty Corp.*, 172 Md. 138, in which the earlier cases are collected and reviewed, there had been an offer to dedicate paper streets over fifty years before which had

not been accepted. The property in which the proposed streets were to be was under cultivation at the time of the offer and continued to be cultivated and indistinguishable from the surrounding area. The owners of the property paid taxes on the land within the lines of the street. Municipal plats failed to show the streets, showing the area as private property. The Court held on the strength of *Baldwin* that the City was estopped to assert an easement and that the full title was in the original owners or their privies in title because the total lack of evidence of assertion of municipal ownership and the abundant evidence of assertion of private ownership amounted to a manifestation, after fifty years, of an intention to have abandoned the right to accept or claim an easement.

The Maryland cases have held, we think, no more than that a private claimant to an easement in a public street, who had title to the fee of the bed of the street may acquire ownership of the easement by what in effect is equitable prescription if he shows an abandonment by the municipality of the easement for at least as long as the period necessary to obtain title at law by adverse possession. That abandonment is not to be presumed from non-assertion of ownership or non-user by the municipality, even when accompanied by user and acts evidencing ownership by the holder of the fee in the disputed area, unless it is continued for at least as long as the prescriptive period, would seem to have been reiterated in the *Finance Corp.* case at pages 145 and 147. The holding of equitable estoppel on the latter page is supported by the citation of the *Baldwin* case and the Iowa case of *Weber v. Iowa City,* 93 N. W. 637. Iowa is a leading, if not the leading, jurisdiction on equitable estoppel of municipalities as to roads and streets and its cases uniformly have required abandonment to have continued for at least as long as the period of prescription if equitable estoppel on that basis is to be found. See *Quinn v. Baage,* 114 N. W. 205, where the Supreme Court of Iowa reviews its earlier cases and concludes the law to be as we have suggested. See also 11 McQuillin, *Mun. Corp.* (3rd Ed.), Sec. 30.182; 25 Am. Jur. *Highways* Sec. 114; 39 C. J. S. *Highways* Sec. 131. *Cf. Browne v. M. E. Church,* 37 Md. 108; *Cox v. Forrest,* 60 Md. 74.

We think the record shows that the City never entertained an intention to abandon its easement in Covington Street or that it did so. From the beginning until 1952 all City records, maps and proceedings showed the area as a street. No taxes were assessed on it. City officials, boards and commissions recognized it as a street. In 1914 the City refused to agree that the street was private when the Reeders attempted to have it do so. In 1912 the City began to collect rent (as it continued to do until 1952) which, according to its records, it deemed to be payment for the use of the foot of the street. In 1941 it refused to close the street as the Chesapeake attempted to have it do, and the Commission on City Plan disapproved and found formally that the street was needed for municipal purposes. Later in 1941 and 1942 the City, as a matter of right without asking leave or permission, dug a trench in the middle of the street and installed the two-foot drain pipes. The public made such use of the street as its needs required and so did the City.

The appellees, using the term to include their predecessors in title, seem to have recognized the position of the City. By their own statements they never claimed legal title to the bed of the street. They sought to acquire title from the City in 1914 and again in 1941. They paid rental which, it can reasonably be inferred, was a recognition for thirty years of the ownership of the City of an interest of some kind in the street and not payment for a neighboring pier. When the City installed the drain pipe in 1941-1942, Chesapeake made no claim of a right to stop it and made no protest. It can scarcely be said that the City, up to 1952, did anything to induce the use of the street by the appellees other than not to order them off. The non-user and silence of the City and the user by the appellees, with consciousness of at least a continuous assertion of ownership by the City would not, in our view, amount to an abandonment or raise an estoppel against the City. *Cushwa v. Williamsport; McQuillin, op. cit.,* Sec. 30.182; 25 Am. Jur. *Highways* Sec. 114; and 39 C.J.S. *Highways* Sec. 131, all *supra.*

The contention that, apart from and independent of abandonment, the affirmative acts of the City in 1952 and thereafter estop it from asserting further ownership of the street ease-

ment,. must also be rejected, we think, for two reasons: first, the acts relied on were those of subordinate City officials who could not bind the City to dispose of or abandon property rights held in trust for the public; and second, the appellees' acts were based on knowledge of the facts and the law equal to or greater than those of the City, so that there is not room for the doctrine of equitable estoppel.

In proper cases, where great injustice and loss would otherwise result, a municipality which had the power to act and did act by officials authorized to do so, so as to induce another to expend efforts and monies, may be estopped to deny that its official and binding consent did not induce the expenditures. Such a case was *Hagerstown v. Hagerstown Rwy.*, 123 Md. 183. There the Mayor and Council, by ordinance, authorized an individual and his assigns to supply electricity in Hagerstown and the Board of Street Commissioners entered into a formal contract with him to furnish lights for the City streets and authorized him to erect and maintain light poles in the streets. Later, the Railway Company acquired the individual's rights and the Street Commissioners formally accepted it as a substitute for the individual. The Railway Company built a new plant and erected new poles, and extended lines. Fourteen years later the City of Hagerstown decided to build and operate its own electric light plant. It did so, and sought to require the Railway Company to cease furnishing power to private consumers and to remove all poles from the City streets. The City attacked the validity of its own ordinances, relied on the failure of the Railway Company to obtain municipal consent to operate by an ordinance and said the poles were a trespass and a nuisance.

The Court pointed out that the original ordinance had granted powers and rights not only to the individual but to his assigns, and that the Mayor and Council, as well as the Street Commissioners, knew the Railway Company had taken over and had executed a bond for faithful performance running to the Mayor and Council and had installed poles and replaced, painted and maintained them as directed by the Mayor and Council, and that the City had used the poles for its fire alarm system. It held that it would be most inequitable to permit

the City to say it had not given consent to what had been done and to require removal of the poles. Reliance was laid on the rule that a municipality which has the power to grant a franchise and by authorized boards or officials purports to grant one will not be heard to say later that its grant was invalid if the grantee at effort and expense availed himself of its permissions. Cited were 4 McQuillin, *Mun. Corp.*, Sec. 1687 (dealing with franchises) and 3 Dillon, *Mun. Corp.* (5th Ed.), Sec. 1242 (a section also dealing with franchises and one entirely different from that relied on in the *Baldwin* case). Because the opinion (p. 194) then refers to the *Baldwin* case and, after saying that the principle of estoppel there asserted was based on abandonment, says "but the principle announced is not founded upon an abandonment of a street or highway, and may be applied wherever under all the circumstances justice requires it," the appellees would have the doctrine apply in the case before us. We think that in the context in which it is found, the quoted language means essentially that in cases as to the effectiveness of a grant of a franchise by a municipality, equitable estoppel is not necessarily based on abandonment and that the difference between the facts of the *Hagerstown* case and those of the instant case make the former inapposite and not controlling.[3]

---

3. Other cases similar to the Hagerstown case include Okla. City v. Pratt (Okla.), 95 P. 2d 596 (in which the property—a park—was held in a proprietary capacity and the City Manager and the City Solicitor, both acting within the scope of their authority, disclaimed interest); State v. McIlravy (Neb.), 181 N. W. 554 (an ordinance of the City Council authorized the railroad to build chutes and platforms in the street); City of Superior v. Northwestern Fuel Co. (Wis.), 161 N. W. 9 (in which on a plat, approved by the proper City officials and recorded, a street, formerly offered for dedication but never accepted, was returned to the status of a private lot and sold to the Fuel Co. which spent several hundred thousand dollars improving it; the City had made a contract with the Fuel Co. to put a sewer through the land, again acting by authorized officials, and had agreed the land was privately owned; the City had assessed taxes on the land which were paid); City of Los Angeles v. Borax Consolidated, 20 F. Supp. 69, aff'd 102 F. 2d 52 (in 1917 City agreed formally by compromise and settlement of a law suit that an island in the harbor was privately

580

Estoppel against a municipal corporation growing out of affirmative action must be predicated upon the acts or conduct of its officers, agents or official bodies who are acting within the scope of their authority. 10 McQuillin, *Mun. Corp.* (3rd Ed.), Sec. 28.56; 31 C. J. S. *Estoppel* Secs. 138, 142, 146; 38 Am. Jur. *Municipal Corporations* Sec. 669.

The claim of appellees in this aspect of their case rests essentially and fundamentally on the 1952 letter of Mr. McAllister to the deputy comptroller because subsequent acts of City officials relied on were based on that letter. In *Gontrum v. City of Baltimore,* 182 Md. 370, Thomas Gontrum gave the City a right-of-way on the representation of an official in the sewer department and a predecessor of Mr. McAllister in the law department that a street was to be opened, to the advantage of Gontrum, through his property, and that he would receive full compensation for any land taken. The street was not opened and suit was brought to require that the pipes be removed or that the City pay for the right-of-way. The Court denied relief, saying that the employee in the sewer department and Mr. McAllister's predecessor in charge of real estate matters in the City Solicitor's office were "subordinate City officials" and that "[i]t is a fundamental principle of law that all persons dealing with the agent of a municipal corporation are bound to ascertain the nature and extent of his authority" (p. 375). The Court added, in answer to the claim that the City was estopped:

"Generally, no estoppel as applied to a municipal corporation can grow out of dealings with public officers of limited authority where such authority has been exceeded, or where the acts of its officers and agents were unauthorized or wrongful. No representation, statement, promises or acts of ratification by officers of a public corporation can operate to estop it

owned; *City itself paid $250,000 to buy part of island;* harbor Commissioners, on advice of City Attorney told Borax that island was private property; Borax, on strength of these prior City acts and representations by authorized officials, bought part of the island for $140,000, spent $1,500,000 to improve it and abandoned its plants in other places; years after, City sought a right-of-way as matter of grace from Borax and City was estopped).

to assert the invalidity of a contract where such officers are without power to enter into such a contract on behalf of the corporation. \* \* \*

"In *Reese on Ultra Vires,* paragraph 192, it is stated: 'Every person is presumed to know the nature and extent of the power of municipal officers, and therefore cannot be deemed to have been deceived or misled by acts done without legal authority.'" (p. 378)

See the *City of New York v. Wilson and Co.* (N. Y.), 15 N. E. 2d 408, 414 (the Engineer of the Department of Docks and Corporation Council advised a claimant [erroneously] that it had title by adverse possession; the Court said: "The city is not estopped from asserting its rights \* \* \* since the errors of law of city employees and officers are not binding upon the city.") ; *Alexander Co. v. City of Owatonna* (Minn.), 24 N. W. 2d 244 (building permit issued by City Engineer when charter required the Council to issue it—City not bound) ; *City of Fergus Falls v. Whitlock* (Minn.), 77 N. W. 2d 194; *Rolison v. Puckett* (Tex.), 198 S. W. 2d 74 (unauthorized representations of tax assessor and City Attorney not binding on City).

We think the appellees were bound to know that Mr. McAllister could not waive or dispose of municipal property rights or authorize abandonment of a street and cannot predicate an estoppel against the City on his conclusion that Covington Street was privately owned, a conclusion wrong as a matter of law as Mr. McAllister frankly admitted and stressed.

The appellees had a complete knowledge of the background, facts and circumstances relating to the status of Covington Street. Their total knowledge was at least equal to that of the City. Their present counsel had made an examination of title in 1941 in connection with a dispute with a neighbor. It was upon appellees' urging that the 1952 McAllister letter was written. Counsel on one occasion refers to "our joint investigation." Where the knowledge of both parties is equal, an estoppel will not be held to have arisen, 2 Elliott, *Roads and Streets*, Sec. 1189, and where the parties labor under a mutual mistake of law resulting in acts by one, such acts do not create an estoppel

as a matter of law nor does misconstruction of the legal effect of all relevant facts known to both sides. 31 C. J. S. *Estoppel* Sec. 71, p. 436, and cases cited in note 98. In the *Gontrum* case, stress was laid on the fact, in connection with the denial of appellant's claim of estoppel by the City that his two lawyer brothers had made their own independent investigation of the facts on his behalf before he acted. *Cf. Browne v. Church, supra.*

After the procuring of the 1952 McAllister letter, the appellees undertook what would seem to have been a planned series of steps not induced by the City to fortify their claim to full title to Covington Street by the putting on record the straw deed quoting the 1952 McAllister letter, seeking abatement of the rental payments and the assessment of taxes, the obtention of the permit for the fence, and then the building of the pier with approval of the Harbor Engineer. It would appear that the pier was immediately necessary at that time to the continuation of Chesapeake's business and building it so that two-thirds of its width was opposite the foot of Covington Street would seem to have been a calculated risk which may not have been great because access to it from Chesapeake's property would have been available and part of it at least could have continued to be used even if Covington Street were held to be a public street.

The appellees have not been badly used even if the full cost of the pier, $12,000, be assumed to have been wasted by Chesapeake. The Reeders and Chesapeake had no title to the street and, as trespassers, used it almost free of charge for more than sixty years to their benefit, knowing they were encroachers. If the financial advantage accruing to them over the years could be translated into a dollar figure, it is most likely that their ledger would show a profit from this use far larger than $12,000.

We are not persuaded that this is the exceptional case where injustice sufficient to overcome the superior and generally overriding claims of the public would result if estoppel was not invoked against the City. The view we entertain requires that the City be granted the relief it sought and a holding that the City owns the easement in Covington Street it acquired in 1783.

The appellees' claim that Covington Street grew by accretion and that, in any event, it has title to the accreted part,

must fail, assuming for the purpose of the decision that it could otherwise prevail, because the record does not contain significant factual support of substantial accretion or, if any there was, how much.

> *Decree reversed, with costs, and case remanded for passage of a decree consistent herewith.*