681 A.2d 584

**Henry F. HARTLOVE, Personal Representative of the Estate of Claude Faye Bass,**

v.

**The MARYLAND SCHOOL FOR the BLIND.**

**No. 1706, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Aug. 30, 1996.

312

**314**

Oren D. Saltzman, Ellicott City (Robert C. Prem and Prem & Dumler, on the brief), Baltimore, for Appellant.

Michael James Kelley (Douglas G. Worrall, James E. Myers and Smith, Somerville & Case, L.L.C., on the brief), Baltimore, for Appellee.

Argued before WILNER, C.J., and CATHELL and HOLLANDER, JJ.

HOLLANDER, Judge.

Henry F. Hartlove, appellant and cross-appellee, is the personal representative of the Estate of Claude Faye Bass. The Maryland School for the Blind ("the School"), appellee and cross-appellant, is the residuary legatee under Ms. Bass's will. The School instituted suit against Hartlove, both in his representative and individual capacities, in the Circuit Court for Baltimore County, alleging, *inter alia,* that Hartlove had mismanaged Ms. Bass's estate and had misappropriated estate assets. In particular, the School contended that certain bank accounts owned jointly by Hartlove and the decedent, with right of survivorship, were actually property of the estate, and that Hartlove unlawfully converted the funds in these accounts after Ms. Bass's death.

The trial judge submitted to the jury the School's claims of breach of fiduciary duty, conversion, and unjust enrichment. The jury found in favor of the School on the breach of fiduciary duty count, but found in favor of Hartlove on the remaining counts. Hartlove now presents two issues for our determination:

I. Whether the Jury Instruction on Breach of Fiduciary Duty constituted reversible error since Maryland law does not recognize a separate or independent cause of action for Breach of Fiduciary Duty?

II. Whether the trial Court committed reversible error in submitting Count II of the Complaint, Breach of Fiduciary Duty, to the jury as fact finder since it is an equitable claim exclusively within the province of the trial judge?

In its cross-appeal, the School presents three issues for our consideration:

I. Did the jury instructions constitute reversible error where the judge instructed the jury that they "may wish to consider" rather than "must" consider whether Mrs. Bass made a gift of the bank accounts to Defendant during her lifetime and where the judge instructed the jury that the signature cards alone could be considered sufficient evidence of an intent to make a gift of the bank accounts to Defendant?

II. Did the refusal by the trial judge to instruct the jury that they could not rely upon the signature cards alone to establish gifts constitute reversible error?

III. Did the refusal by the trial judge to give the jury an instruction as to the definition of "clear and convincing evidence" constitute reversible error?

As we perceive no reversible error, we shall affirm.

### FACTUAL SUMMARY

Claude Faye Bass, who was known as Faye, died on November 28, 1992. Pursuant to her will, appellant was appointed personal representative of the estate. On May 25, 1994, the School filed suit against Hartlove and requested a jury trial.[1] The complaint sought multiple forms of relief, including compensatory and punitive damages, injunctions, a constructive trust, an accounting, and Hartlove's removal as personal representative of the estate of Ms. Bass.

The School principally disputed appellant's right to the money that remained in four bank accounts at the time of Ms. Bass's death. One account was opened at First Bankers of Indian River County (later called First Union National Bank of Florida), two savings accounts were opened at Loyola Federal Savings and Loan, and the fourth account was at Maryland National Bank. The School claims that the funds in the bank accounts belong to the estate, and that Ms. Bass did

---

1. The School also initiated proceedings against appellant in the orphans' court, which are not at issue in this appeal.

not intend for appellant to receive these funds. It asserted in its suit that,

> The bank accounts were opened for the sole purpose of providing convenience accounts such that [Hartlove] would be in a position to manage the financial affairs of Bass and such that [Hartlove] would be better able to review and pay Bass's bills. Bass's personal funds were placed in those accounts not as a gift to [Hartlove], but for the sake of convenient money management.

The School also argued at trial that, to the extent that Ms. Bass did have such an intent, her method constituted an attempt to make a future transfer that would take effect at her death, and thus was an ineffective testamentary distribution without the required formalities of a will.

Faye Bass was described as a kind but strong-willed and independent woman, who did not hesitate to let others know how she felt and who would never let anyone dominate her. She had no mental or physical impairments, lived in her own house, and drove a car until the time of her death. Her husband, Johnny Bass, died in 1981. The Basses had no children.

The Hartlove family moved next door to the Basses in 1960. The family consisted of Henry W. Hartlove (appellant's father), Sophie Hartlove (appellant's mother), and their children, appellant, Nancy, and Craig. The two families formed a very close friendship and were "like family."

Ms. Bass became particularly close with appellant. Indeed, she referred to him as her son. According to appellant's father, Ms. Bass "looked upon my son as her son. She thanked me. She said, Henry, I thank you and Sophie both for, you might say, letting me have a son." The younger Hartlove, who is an accountant, became a trusted advisor to his "second mother," assisting her with her finances and checkbook.

The elder Henry Hartlove was both a certified public accountant and an attorney, now retired from his practices. From time to time, Ms. Bass would seek advice from him,

including financial advice. He prepared Ms. Bass's tax returns and balanced her checkbook. The elder Hartlove also drafted Ms. Bass's will, which she executed on June 13, 1992. He testified that the will was "based strictly on what Faye Bass told me." Richard and Theresa Krejci, two of Ms. Bass's neighbors, witnessed her execution of the will. They testified that Ms. Bass was competent at the time and understood what she was signing.

In her will, Ms. Bass made several bequests to the elder Hartlove's relatives. Item 2(c) of the will provided for a $20,000 special bequest to appellant. Item 3 of the will instructed the personal representative to sell Ms. Bass's Florida condominium and distribute the proceeds equally between George Graffe and appellant as trustee for his minor son, John A. Hartlove, until the son reached the age of twenty-five. Further, the will named the School as the residuary legatee.[2] The School, according to David L. Evans, its chief operating officer, "is an educational institution, known nationwide for the education of the visually impaired and blind." According to Jacqueline Hartlove, Ms. Bass said "that she wanted to leave [the School] a little something, because she had had cataract surgery and she knew the importance of eye sight."

After Ms. Bass died, appellant made the arrangements for her funeral. Subsequently, appellant filed a petition for probate with the Register of Wills for Baltimore County to open Ms. Bass's estate. *See* Maryland Code (1974, 1991 Repl.Vol.) §§ 5–201, 5–206 of the Estates and Trusts Article ("E.T.").

At the time of Ms. Bass's death, the funds in the four joint bank accounts that are in issue totalled approximately $176,-000. After Ms. Bass died, appellant withdrew all of the money from the accounts and closed them. He deposited the money from the Loyola Federal accounts, which contained approximately $91,000, into the estate checking account that he

---

**2.** The will was exactly like a will that Ms. Bass had executed in 1986, with the exception that the earlier will had named Children's Hospital, not the School, as the residuary legatee.

opened. He characterized this action as a "temporary loan" to the estate. Subsequently, appellant removed the money from the estate account.

Under E.T. § 7–104(a) and Maryland Rule 6–301(c), appellant was required to file with the Register of Wills, within twenty days after the date of his appointment as personal representative, a "List of Interested Persons," containing the names and addresses of all of Ms. Bass's heirs and all legatees named in the will.[3] Although the School was named as the residuary legatee in Ms. Bass's will, appellant did not include the School on the list. The form instructions provide, in part: "Interested persons include decedent's heirs (surviving spouse, children, and other persons who would inherit if there were no will) and, if decedent dies with a will, the personal representative named in the will *and all legatees (persons who inherit under the will)*." Md. Rule 6–316 (emphasis supplied). Appellant testified that he did not include the School on the list because he did not believe that the School was a "person."

Paul Ventura, the Chief Deputy Register of Wills for Baltimore County, testified that his office has several "safety nets" to make sure that all interested persons are properly listed and notified of estate proceedings. He conceded, however, that in this case the safety nets "failed." Accordingly, the School was not notified of the opening of the estate or Hartlove's subsequent filing of the estate's administration accounts.[4]

On December 9, 1992, appellant filed with the Register of

---

**3.** The purpose of the list is to allow the Register to send a written notice of the opening of the estate to all interested persons. *See* E.T. § 2–210; Md. Rule 6–317.

**4.** An "administration account" is list of estate assets, income, expenses, and distributions that the personal representative must file with the Register of Wills. *See* E.T. §§ 7–301 to 7–305. The personal representative is required to send a written notice to all interested persons of the filing of an administration account. E.T. § 7–501(a). Appellant did not do so.

Wills the first of two information reports for the estate.[5] The report listed the Maryland National account, but not the Loyola Federal or First Union accounts. On February 19, 1993, Hartlove filed a supplemental information report that listed the First Union account and both Loyola Federal accounts. Hartlove testified that he could not recall why he omitted the three accounts from the initial report, and acknowledged that it was "wrong" to omit them and that they "should have all been included." He dismissed as "absurd," however, the School's charge on cross-examination that he failed to list them because he thought "that [he] could get away with taking the Maryland National Bank account...." He asserted "that [he] had a question in [his] mind about the Loyola account and the other account."

The School did not learn of its status as residuary legatee until 1994. On January 12, 1994, after the orphans' court approved appellant's final administration account, appellant mailed to the School an unsigned check for approximately $44,000, which Evans received. At that point in time, Evans had never heard of Ms. Bass and he subsequently learned that the School had not received any notification or other information about the estate previously. Evans contacted Hartlove and asked for a signed check, a copy of Bass's will, and an "accounting" to show how the School's distribution was calculated. A few days later, according to Evans, he received only a signed check in the mail. On several occasions, Evans attempted to contact Hartlove in order to see the will and obtain the accounting. When Evans did not receive a response, he travelled to the office of the Register of Wills and examined the file on Ms. Bass's estate. That is when he

---

**5.** An "information report" is a list of assets in which the decedent had an interest as a joint tenant, assets that the decedent transferred for less than full and adequate consideration within two years prior to death or in contemplation of death, and assets that pass to a beneficiary upon the decedent's death without the need for probate. *See* Maryland Code (1988), § 7–224 of the Tax–General Article ("T.G."); Rule 6–404. The personal representative must file the information report with the Register of Wills within ninety days after receiving his or her letters of administration. T.G. § 7–224(a).

learned of the four joint bank accounts. Thereafter, he consulted with Michael Kelly, one of the School's attorneys and a member of its board of directors. After an investigation, the School concluded that the bank accounts should have been part of the estate and that the School's residuary distribution was too small.

At trial, Stanley E. Crosin, a certified public accountant whom the School called as an expert, testified that he examined the records for each of the bank accounts and concluded that the accounts "appeared to be operated for the benefit of Mrs. Bass." He stated:

All of the checks appeared to be the normal recurring type of living expenses that one would expect to find flowing through an individual's checking accounts with the exception of transfers that were made periodically from one account to another account, for example, from a Maryland National account to the First Union account or from the Loyola account to the Maryland National account.

The defense introduced signature cards for the First Union account and both Loyola Federal Accounts. They were signed by Ms. Bass and appellant, and provided that the accounts were held in a joint tenancy with the right of survivorship, and that either account holder could withdraw funds. One of the Loyola signature cards stated that there was a "CONCLUSIVE PRESUMPTION OF CREATING A JOINT TENANCY & TO VEST TITLE TO FUNDS IN SURVIVOR." (Capitalization in original.) The other Loyola signature card stated, in part: "It is agreed by the signatory parties with each other and by the parties with you that any funds placed in or added to the account by any one of the parties *are and shall be conclusively presumed to be a gift and delivery* at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account." (Italics in original.) No signature card for

the Maryland National account was introduced into evidence.[6]

The elder Hartlove testified [7] that the names of the elder Hartlove and the Basses were originally on the four accounts but, when the elder Hartlove retired, his name was dropped and appellant's name was added. He said that he had explained to Ms. Bass the concept of a joint account when she commented that she wanted to leave money for one of her nieces. Hartlove said that he advised her: "Faye, if you want to leave anything, you have an account. You have an account with her, in which you could continue to be able to draw from it and so on, but if she hadn't taken it out at the time of your death, it would be her money." The elder Hartlove testified that he did not regard himself an owner of the money in the accounts, however. He also stated that he did not recall withdrawing any money from the accounts.[8] He further testified that his son paid "some" of Ms. Bass's bills, although he was not sure about the point.

Appellant adduced testimony to establish that Ms. Bass viewed the money as belonging to appellant and Ms. Bass. The following testimony occurred during Jacqueline Hartlove's direct examination:

[HARTLOVE'S COUNSEL]: What did she say to you?

MS. HARTLOVE: She told me, she said that, you know, she had bank accounts and that he was on all her bank accounts, and if there was ever—if we ever needed any money, all we had to do was write a check.

---

6. The Maryland National Bank account was funded with money from a trust established in the will of the decedent's husband, Johnny Bass, who predeceased Ms. Bass; the statements for that account were sent to appellant's address.

7. The elder Hartlove was called by the School as an adverse witness. He also testified for the defense.

8. Mr. Hartlove testified: "However, in spite of the fact that I was on there, I don't know whether I ever did anything with the accounts. I don't think I did. To the best of my recollection, I didn't even draw a check, but my name was on those accounts, yes."

[HARTLOVE'S COUNSEL]: All right. Did she discuss the money in the bank accounts with you as to whether it was your money or her money?

MS. HARTLOVE: She always referred to her bank accounts as her money, my husband's and mine.

On Ms. Hartlove's redirect examination, the following exchange took place:

[HARTLOVE'S COUNSEL]: What did she say about her money, Mrs. Bass' money, and your husband's money? What did she say?

MS. HARTLOVE: It was our money, my husband's and mine.

[HARTLOVE'S COUNSEL]: Okay. But she didn't tell you that she was distributing it to you; did she?

MS. HARTLOVE: No.

Ms. Hartlove also stated that, when the Hartloves and Ms. Bass would go out to dinner, they would argue over who should pay the check, and Ms. Bass would say, "I don't know why we do this, because that money is your money, and I am paying for dinner with your money." John Hartlove, appellant's son, testified that he heard Ms. Bass say to appellant that "whenever you want money, take it, it's yours, it's your money."

According to appellant, "[Ms. Bass] referred to it as my money, my money meaning my wife's and myself, because she said it around my wife many times." He conceded that the checks drawn on the Loyola and First Union accounts were used to pay Ms. Bass's "day-to-day expenses" while she was alive. Nevertheless, he denied the School's charge that he placed the Loyola Federal money in the estate bank account because he believed that it belonged to the estate.

Richard Krejci, who was called as a witness by appellant, testified that Ms. Bass mentioned that appellant's name was on certain bank accounts, and "[t]hat's about all she said, other

than the fact that she needed someone on there to manage her affairs when she was in Florida,[9] to pay some of the bills and that sort of thing, and that is pretty much the extent of it." The following exchange occurred during the direct examination of Theresa Krejci:

[HARTLOVE'S COUNSEL]: Did [Ms. Bass] describe [appellant] as her financial advisor?

MS. KREJCI: Not in those exact terms, but she sought his advice a lot of times. *She told me on many occasions that he had one of her checking accounts and would handle paying bills and stuff for her,* and she did discuss that with me.

(Emphasis supplied.)

At the close of the School's case, the circuit court granted appellant's motion for judgment with respect to breach of fiduciary duty by appellant individually, breach of contract, negligence, fraud, negligent misrepresentation, undue influence, and professional malpractice. Later, during exceptions to the jury instructions, the School objected to the submission of the breach of fiduciary duty count to the jury, contending that it was an equitable claim that had to be decided by the court. Appellant made no such objection, however. The remaining counts—breach of fiduciary duty by appellant in his capacity as personal representative, two conversion counts, and unjust enrichment—were ultimately submitted to the jury. The jury returned a verdict in favor of the School only on the breach of fiduciary duty claim; it awarded $25,000 in damages. After the trial, the judge stated that, had he "been sitting as the trier of fact alone," as a court of equity, he would have found no breach of fiduciary duty. The judge then decided not to order an accounting, because he did not believe that one was "appropriate."

---

**9.** According to Jacqueline Hartlove's testimony, Ms. Bass would stay in Florida each year from the first week in January until one week after Easter.

## *DISCUSSION*

### *Hartlove's Appeal*

### I.

Appellant contends that, because there is no independent cause of action for breach of fiduciary duty, the trial court erred in instructing the jury on that claim. The court instructed the jury, in pertinent part, as follows:

. A fiduciary relationship exists when one party is under a duty to act for or give advice for the benefit of another. The fiduciary duty requires a party with such responsibility to act solely in the interest of the beneficiary, without any self-interest or self-dealing.

Fiduciary [sic], who commits a breach of his duty, is guilty of tortious conduct and the wronged party, the party is entitled to damages for harm caused by the breach. Where either a confidential relationship or fiduciary duty exists, the burden of production of evidence falls upon the party in whom responsibility has been imposed to establish that his conduct was proper under the circumstances.

Thus, as to the allegation by the Plaintiff of breach of fiduciary duty, it is the burden of the Defendant to produce evidence showing or tending to show that, in all material respects, he acted with fairness and candor toward Mrs. Bass and her estate. If you are satisfied from all of the evidence that he did so act, then you should find that he did not breach his fiduciary duty.

The judge also advised the jury that a confidential relationship existed between Hartlove and Ms. Bass. After the judge charged the jury, appellant said:

I would respectfully except to three issues. The first one is the instruction with respect to a cause of action in breach of fiduciary duty. **I don't believe there is such a cause of action,** and that goes along with the exception to the verdict

sheet, asking if there is a breach of fiduciary duty, asking them to find that there is a breach of fiduciary duty.

(Emphasis supplied).

Appellant emphasizes that he does not contend that a fiduciary may never be accountable for misdeeds. Rather, he contends that the specific claim against the fiduciary must be based on a "recognized" cause of action, such as fraud.

## A.

█ We first consider the School's contention that appellant waived the argument that there is no cause of action for breach of fiduciary duty, because he failed to make a motion for judgment on this basis at the close of the evidence. The School asserts that Hartlove's motion for judgment notwithstanding the verdict, in which he did argue that there is no cause of action for breach of fiduciary duty, did not preserve the issue, because Hartlove had not moved for judgment on that ground. *See* Md. Rule 2–532(a) ("In a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion."). The School also argues that Hartlove is attempting to "make an end run" around the rule by couching his contention as a challenge to a jury instruction. The School states: "Defendant cannot rectify his failure to make a motion for judgment on that ground and attempt to bootstrap himself by arguing that a jury instruction, *the substance of which he does not even contend was incorrect,* is allegedly reversible error." (Emphasis the School's.)

█ The School relies heavily on our decision in *Fearnow v. Chesapeake & Potomac Telephone Co. of Maryland,* 104 Md. App. 1, 655 A.2d 1 (1995), *aff'd in part and rev'd in part,* 342 Md. 363, 676 A.2d 65 (1996). In *Fearnow,* we determined that the trial court had not erred in declining to give the following instruction:

> I have ruled that [the defendant] is responsible for the injuries and damages to [the plaintiff] in this case so you need not concern yourself with that question.
>
> You need only decide the amount of damages that should be awarded.

*Id.,* 104 Md.App. at 23, 655 A.2d 1. We said that the proposed instruction was improper [10] and, "for the sake of thoroughness", we noted that the requested instruction was also an impermissible "attempt to have the trial court grant a motion for judgment without employing the necessary procedural mechanism for making such a motion." *Id.,* at 27, 655 A.2d 1. We stated: "Appellant . . . ignored the mandate of our Rules and blazed his own brave, new procedural trail, attempting to have judgment granted by way of jury instruction, rather than by the appropriate motion to the trial court." *Id.,* 104 Md. App. at 27–28, 655 A.2d 1. Our decision was in line with the general principle that "a litigant may not use an instruction as a vehicle for adding a cause of action, objecting to or striking out allegedly improper evidence, or as an avenue for directing a verdict." *Zeller v. Greater Baltimore Medical Center,* 67 Md.App. 75, 90, 506 A.2d 646 (1986).

Hartlove's conduct, however, is distinguishable from the conduct found improper in *Fearnow.* The instruction in *Fearnow* sought to have the judge determine, as a matter of law, that the defendants were liable to the plaintiffs, and to instruct the jury to that effect. Thus, the request was tantamount to a motion for judgment based on the *sufficiency of the evidence. See Bartholomee v. Casey,* 103 Md.App. 34, 51, 651 A.2d 908 (1994), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995). We even referred to the instruction as a "verdict directing instruction." Hartlove's objection to the instruction, however, did not constitute an attempt to have the trial judge direct a verdict in favor of Hartlove based on the sufficiency of the evidence.

---

**10.** The Court of Appeals did not address this particular holding.

In our view, appellant timely objected to the jury instruction, based on the contention that Maryland does not recognize the tort of breach of fiduciary duty. His objection complied with Maryland Rule 2–520(e), which requires a party to state "distinctly the [instruction] to which the party objects and the grounds of the objection." Therefore, the issue is preserved.

## B.

We turn next to the merits of the issue. As both parties correctly note, the Court of Appeals has not yet decided whether a cause of action exists for breach of fiduciary duty. Instead, the Court of Appeals has assumed, without deciding, the viability of such a cause of action. In *Adams v. Coates,* 331 Md. 1, 626 A.2d 36 (1993), involving a dispute between partners, the Court stated:

> Breach of fiduciary duty, as a tort, has been alleged by pleaders whose cases have come to this Court, and our opinions have used the term to describe claims asserted, but we have not opined on the existence of the tort or torts, or on its or their elements or rules of damages.... We need not so opine in this case.

*Id.,* 331 Md. at 11–12, 626 A.2d 36. More recently, in *Alleco Inc. v. The Harry & Jeanette Weinberg Foundation, Inc.,* 340 Md. 176, 191–92, 665 A.2d 1038 (1995), the Court similarly assumed, "solely for purposes of discussion in th[e] case, that Maryland law does recognize the tort of breach of fiduciary duty." The issue is, however, squarely before us.[11]

In analyzing this issue, we must consider the concept of fiduciary duty and the role of personal representative. The

---

**11.** The dissent argues that the failure of the Court in *Adams* and *Alleco* to resolve the question of the viability of the cause of action means that this Court should not do so. In those cases, however, it was not necessary for the Court to decide the issue. Moreover, while the Court did not recognize the cause of action, neither did it reject it. Based on the dissent's reasoning, we could argue that, because the Court in *Adams* and *Alleco* had opportunities to *reject* the cause of action and did not do so, we should not do so either.

authorities are rife with language describing the duties of fiduciaries and that a personal representative is, indeed, a fiduciary. E.T. § 7–101(a) provides:

A personal representative is a fiduciary. He is under a general duty to settle and distribute the estate of the decedent in accordance with the terms of the will and the estates of decedents law as expeditiously and with as little sacrifice of value as is reasonable under the circumstances. He shall use the authority conferred upon him by the estates of decedents law, by the terms of the will, by orders in proceedings to which he is a party, and by the equitable principles generally applicable to fiduciaries, fairly considering the interests of all interested persons and creditors.

A personal representative must "meet the specific requirements of a fiduciary as that term is applied to personal representatives; and she must act reasonably and in good faith." Hon. Albert W. Northrop & Robert A. Schmuhl, DECEDENTS' ESTATES IN MARYLAND § 6–4(e) at 243 (1994). The personal representative's "office is in the nature of a trustee for the creditors, legatees and next-of-kin of the deceased, and he is required to preserve the property of the estate apart from his own, earmarked." *Wheatley v. Fleischmann,* 216 Md. 157, 162–63, 140 A.2d 152 (1958). In *Bastian v. Laffin,* 54 Md.App. 703, 708, 460 A.2d 623 (1983), we described the general duty of a personal representative:

[The personal representative] has an obligation to protect and preserve the property entrusted to him .... In carrying out that obligation, he is required to act in good faith, and must perform his fiduciary duties with the same degree of care and diligence that would be exercised by a prudent person under similar circumstances in the management of his own affairs.

Similarly, Allan J. Gibber, in his book GIBBER ON ESTATE ADMINISTRATION (3rd ed. 1991), describes the following duties of a personal representative:

The standard of care required of a fiduciary includes:

1. The exercise of the care, skill and diligence of a reasonably prudent person dealing with his or her own property;

2. The exercise of good faith and loyalty to all the beneficiaries;

3. The lack of self-dealing;

4. The exercise of reasonable watchfulness over investments; and

5. The maintenance of full, accurate and precise records. *Id.* at 3–1.

Given the standard of conduct imposed upon fiduciaries, we are of the view that fiduciaries who breach their duty should be held accountable under an independent cause of action aimed at such conduct.[12] This view is consistent with § 874 of the RESTATEMENT (SECOND) OF TORTS (1979), which states specifically: "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."

Furthermore, our research has revealed that several other jurisdictions have recognized the tort of breach of fiduciary duty. *See Long v. Lampton,* 324 Ark. 511, 922 S.W.2d 692, 696–97 (1996); *Davis v. Church of Jesus Christ of Latter Day Saints,* 258 Mont. 286, 852 P.2d 640, 649 (1993); *Loehrke v. Wanta Builders, Inc.,* 151 Wis.2d 695, 445 N.W.2d 717, 720 (App.1989); *Destefano v. Grabrian,* 763 P.2d 275, 284 (Colo. 1988); *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (N.Y.App.Div.1987); *Widett & Widett v. Snyder,* 392 Mass. 778, 467 N.E.2d 1312, 1316–17 (1984). *See also Gray v. Ward,* Case No. WD 50264, 929 S.W.2d 774, 782 (1996) (claim for breach of fiduciary duty is distinct from claim for "clergy malpractice"); *Amerco v. Shoen,* 184 Ariz. 150, 907 P.2d 536, 540–42 (App.1995) (jury may not award nominal

---

**12.** Contrary to the dissent's suggestion, this Court has previously recognized "new" causes of action. *See, e.g., Jones v. Harris,* 35 Md.App. 556, 371 A.2d 1104 (1977) (recognizing the tort of intentional infliction of emotional distress), *aff'd, Harris v. Jones,* 281 Md. 560, 564–66, 380 A.2d 611 (1977).

damages for breach of duty by corporate fiduciary; compensatory damages and restitution constitute an "adequate range" of relief); *InterFirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882, 907 (Tex.Ct.App.1987) ("an intentional breach of a fiduciary duty is a tort justifying the award of punitive damages"); *Harman v. Masoneilan Int'l, Inc.,* 442 A.2d 487, 492–96 (Del.1982) (complaint stated a cause of action in equity for breach of fiduciary duty of majority shareholder to minority shareholder); *id.* at 500 ("the relief available in equity for tortious conduct by one standing in a fiduciary relation with another is necessarily broad and flexible" [citing § 874 of the RESTATEMENT] ); *King Mountain Condominium Association v. Gundlach,* 425 So.2d 569, 571 (Fla.Dist.Ct.App.1982); *Middlesex Insurance Co. v. Mann,* 124 Cal.App.3d 558, 177 Cal. Rptr. 495 (1981) (evidence created jury question as to director's breach of fiduciary duty to corporation). *Contra Kinzer v. City of Chicago,* 128 Ill.2d 437, 132 Ill.Dec. 410, 414, 539 N.E.2d 1216, 1220 (1989) (Illinois does not recognize the Restatement view, but instead regards breach of fiduciary duty as controlled by the substantive laws of agency, contract, and equity).

■ We recognize, of course, that we are not bound by the Restatement or the decisions of courts elsewhere. But appellant has not advanced any sound reasons to reject this position. To the contrary, adoption of appellant's view would result in a form-over-substance rule requiring victims of breaches of fiduciary duty to find "recognized" causes of action in which to fit their claims.[13] For the foregoing rea-

---

13. The dissent argues that there is no need to recognize a cause of action for breach of fiduciary duty, because "fully adequate remedies already exist" for such conduct. The Court of Appeals, however, rejected a similar argument in *Widgeon v. Eastern Shore Hospital Center,* 300 Md. 520, 479 A.2d 921 (1984), in which it held that a private cause of action exists for violations of Articles 24 and 26 of the Maryland Declaration of Rights. The defendants in that case argued that the cause of action should not be recognized because the plaintiff had other available remedies under non-constitutional tort law and 42 U.S.C. § 1983. The Court disagreed, saying:

sons, we hold that breach of fiduciary duty is an independent and viable cause of action in Maryland.[14]

## II.

█ Appellant contends that, even if there exists a cause of action for breach of fiduciary duty, the circuit court erred in submitting this claim to the jury, because it is an "equitable" claim, exclusively within the province of the court. We need not address the merits of this contention, however, because we agree with the School that appellant has failed to preserve this argument.

Appellant asserts that the issue is properly preserved, because it "was raised several times at the trial court level and was the subject of at least one conversation between counsel and the trial judge in chambers." Appellant concedes, however, that it was only *the School* that asserted this objection.[15]

> It is a well-settled rule ... that where a particular set of facts gives rise to alternative causes of action, they may be brought together in one declaration, and where several remedies are requested, an election is not required prior to final judgment.... [T]he existence of other available remedies, or a lack thereof, is not a persuasive basis for resolution of the issue before us.

*Id.*, 300 Md. at 535, 479 A.2d 921. Moreover, the dissent's argument is rebutted by the facts of this very case. The School's breach of fiduciary duty claim was the *only* claim on which it prevailed at trial. Thus, without an independent cause of action for breach of fiduciary duty, it is arguable that the School would not have recovered.

14. As the Court of Appeals stated in *Alleco*, the elements of breach of fiduciary duty are: "(1) the existence of a fiduciary relationship, (2) a breach of duty owed by the fiduciary to the beneficiary, and (3) harm resulting from the breach." *Id.*, 340 at 192, 665 A.2d 1038. Because Hartlove does not challenge the trial court's instruction on the burden of proof with respect to breach of fiduciary duty, we decline to address the subject of burdens of proof and production.

In addition, we emphasize that our decision does not necessarily mean that monetary "damages" may be imposed on fiduciaries for breaches of duty. Based on our conclusion, *infra*, that appellant has not preserved his claim concerning the equitable nature of the tort, we decline to resolve the question of whether relief for its breach is exclusively equitable, or may instead be both legal and equitable.

15. The School made its objection after the trial judge finished instructing the jury. The trial judge, while denying the School's motion for

The earliest point at which appellant presented the issue was *after* trial, in his motion for judgment notwithstanding the verdict.

Recently, in *Hosain v. Malik,* 108 Md.App. 284, 671 A.2d 988 (1996) (*en banc* ), a child custody case, we interpreted Rule 8–131(a) in connection with the trial court's decision to proceed with a hearing in the absence of the child's court-appointed counsel. Appellant's counsel did not object when the court decided to go forward with the hearing. Later, at the *conclusion* of the hearing, appellant's counsel requested that child's counsel be permitted to make a statement on behalf of the child at closing arguments, which were to be held at a later date. *Id.* We held that the issue of proceeding in the absence of the child's counsel was not preserved, because appellant had not timely objected to proceeding with the hearing. The majority stated:

> The primary purpose of [Rule 8–131(a) ] is to ensure fairness to all parties in the case and to promote the orderly administration of law. *State v. Bell,* 334 Md. 178, 189, 638 A.2d 107 (1994). This concern for fairness is furthered by requiring counsel to bring her client's position on the matter at issue to the attention of the circuit court so that the circuit court may pass upon and perhaps correct any potential errors in the proceedings.

*Hosain,* 108 Md.App. at 296, 671 A.2d 988. Because appellant's counsel had not "[brought] her client's position ... to the attention of the circuit court," we concluded, in essence, that she was estopped from pursuing the matter on appeal:

> [A]ppellant's counsel's silence and her failure to object at the time it would have been natural to do so, is naturally and reasonably construed as counsel's waiver of any objection to the absence of the child's attorney. *See Fireman's*

---

judgment, referred to a chambers conference in which the issue was raised: "I am aware, of course, from our discussion as well in chambers, that *the Plaintiff* would like to have the Court rule collaterally on the issues of fiduciary duty and unjust enrichment, since they are somewhat quasi-equitable forms of action, rather than actions at law." (Emphasis supplied.)

*Fund Ins. Co. v. Bragg,* 76 Md.App. 709, 719, 548 A.2d 151 (1988) ("When a party has the option of objecting, his failure to do so is regarded as a waiver estopping him from obtaining review of that point on appeal.")

\* \* \* \* \* \*

Accordingly, after remaining silent and failing to object to the circuit court's procedure, appellant's counsel cannot now complain that the remand hearing improperly proceeded without the child's attorney. As a consequence of appellant's counsel remaining silent in this regard, neither the circuit court nor appellee had any way of knowing of appellant's disagreement to going forward with the remand hearing. Indeed, the only way to construe appellant's counsel's failure to speak up is as an agreement to the manner in which the hearing proceeding. To review this issue now, would be patently unfair to the circuit court and to appellee. *Hosain,* 108 Md.App. at 298, 671 A.2d 988.

*Hosain*'s "estoppel" concept applies here. Appellant's objection to the jury instruction on the ground that there is no recognized cause of action in this State for breach of fiduciary duty did not provide the trial judge with fair notice of appellant's contention that the claim, if it exists at all, is equitable in nature and thus not a matter for the jury to resolve. Cf. *Bowman v. State,* 337 Md. 65, 650 A.2d 954 (1994) (objection to trial court's failure to give particular jury instruction was not preserved, when counsel merely stated to the court that the instruction as given "wasn't exactly what [he] had in mind" and he failed to specify the instruction that he desired). If Hartlove had argued to the trial court that the claim for breach of fiduciary duty, if it existed, was an equitable matter for the court, the trial judge may well have accepted the unanimous view of both parties and opted not to submit the claim to the jury. Having acquiesced, in effect, to the submission of the claim, appellant cannot now adopt his opponent's argument because it suits his purposes.

Finally, Hartlove contends that, even if he did not properly preserve the issue in the trial court, the issue is

nevertheless properly before us, because it is a "jurisdictional" matter which may be raised for the first time on appeal. *See Kaouris v. Kaouris*, 324 Md. 687, 710, 598 A.2d 1193 (1991). He states that his "question presented ... is whether it was within the jurisdiction of the jury to render a verdict on the breach of fiduciary duty claim, or whether it was within the exclusive province of the trial judge to do so."

"Jurisdiction" has been defined fundamentally as the power of a court to decide a case. *See* BLACK'S LAW DICTIONARY 853 (6th ed. 1990); *Stewart v. State*, 21 Md.App. 346, 348, 319 A.2d 621 (1974), *aff'd*, 275 Md. 258, 340 A.2d 290 (1975). Maryland cases have stated, however, that jurisdiction actually refers to two distinct concepts: (1) the *power* of a court to render a valid final judgment; and (2) the *propriety* of granting the relief sought. *Dorsey v. State*, 295 Md. 217, 226–27, 454 A.2d 353 (1983); *First Federated Commodity Trust Corp. v. Commissioner of Securities*, 272 Md. 329, 334, 322 A.2d 539 (1974). But for purposes of the rule that the issue of subject matter jurisdiction may be raised for the first time on appeal, the Court of Appeals has stated that it is only the first of these concepts—the "power" of the court to act, or jurisdiction "in its most fundamental sense"—that may be raised in the first instance in the appellate court. *Kaouris v. Kaouris, supra,* 324 Md. at 715, 710, 598 A.2d 1193.

In *Mattingly v. Mattingly,* 92 Md.App. 248, 607 A.2d 575 (1992), we declined to resolve whether the improper submission of an equitable claim to the jury constitutes a "jurisdictional" defect. We concluded there that the trial court had erroneously submitted the equitable claim to the jury, and that the error was not harmless because it deprived the plaintiff of the benefit of the more lenient equitable burden of proof standard on a critical issue. *Id.,* 92 Md.App. at 262–63, 607 A.2d 575. Nevertheless, we clearly expressed our doubt that a jury's consideration of an equitable matter constitutes a "jurisdictional" defect.

**It may well be that a jury is without power or jurisdiction to decide this purely equitable action.** As noted above, prior to the merger of law and equity in Maryland, a

law court had no jurisdiction over an action for rescission, *Creamer v. Helferstay,* [294 Md. 107, 116, 448 A.2d 332 (1982) ], or one for accounting between partners involving the status of partnership affairs. *McSherry v. Brooks,* [46 Md. 103, 115 (1877) ]; *Morgart v. Smouse,* [103 Md. 463, 468–69, 63 A. 1070 (1906) ]. We have held that the "merger" of law and equity "was not intended to abolish all differences between legal and equitable claims and defenses to them, but only to abolish '[p]leading distinctions between law and equity' and 'to assure that [a]ll claims and defenses are determined in one court.' " *Southern Four v. Parker,* 81 Md.App. 85, 92 [566 A.2d 808] (1989) (*quoting Smith v. Gehring,* 64 Md.App. 359, 370–72 [496 A.2d 317] (1985)). **Thus, relief and defenses that are exclusively within the jurisdiction of equity remain so, despite the merger of the separate forms of pleading and the separate courts.** *See, e.g., Southern Four v. Parker, supra,* 81 Md.App. at 91 [566 A.2d 808] (conditional civil judgment void in case at law for money damages for breach of contract); *Smith v. Gehring, supra,* 64 Md.App. at 370–72 [496 A.2d 317] (equitable doctrine of laches unavailable as a defense to purely legal claim). Moreover, Maryland Rule 2–511(d) expressly provides that "Issues of fact not triable of right by a jury *shall* be decided by the court and may not be submitted to the jury for an advisory verdict" (emphasis added).

**The Court of Appeals, however, has shown great reluctance to order reversal because a trial court's law/equity choice was erroneous.** Instead, it has generally, after acknowledging the law/equity error, simply resolved the case on the merits. *See, e.g., Mayor of Landover v. Brandt,* 199 Md. 105, 107–08 [85 A.2d 449] (1952); *Burns v. Bines,* 189 Md. 157, 164 [55 A.2d 487] (1947). We have found only three cases in which, after holding the law/equity choice erroneous, the Court of Appeals has reversed and remanded the case; and in all three cases the law/equity error was accompanied by another ground for reversal. *See Creamer v. Helferstay,* 294 Md. 107, 116–133 [448 A.2d 332] (1982); *Millison v. Citizens Nat'l Bank,* 256 Md. 431, 439 [260 A.2d

324] (1970); *Senick v. Lucas,* 234 Md. 373, 381 [199 A.2d 375] (1964). Moreover, none of these cases are post-merger cases and none involve wholly equitable claims improperly heard by a *jury.* **Accordingly, we might well be reluctant to find reversal and remand required here solely on jurisdictional grounds.** *But see Creamer v. Helferstay,* 294 Md. at 116 [448 A.2d 332] ("the order appealed from is being vacated on the procedural ground that *a law court has no power* to affirmatively order the rescission of a contract") (emphasis added); *id.* at 133 [448 A.2d 332] (Murphy, C.J., concurring) ("The trial judge sitting ... in an action at law, possessed no equity powers and was therefore *without jurisdiction* to rescind the contract. I would go no further in disposing of the appeal") (emphasis added).

*Mattingly,* 92 Md.App. at 261–62, 607 A.2d 575 (boldface added; italics in original).

As the *Mattingly* opinion noted, however, the case law on the issue is somewhat unsettled. Several cases have held that a contention may not be raised for the first time on appeal that a matter tried in an equity proceeding should have been tried in a court of law. *See Charles County Broadcasting Co. v. Meares,* 270 Md. 321, 328–29, 311 A.2d 27 (1973); *Punte v. Taylor,* 189 Md. 102, 111–12, 53 A.2d 773 (1947); *Stuart v. Johnson,* 181 Md. 145, 147, 28 A.2d 837 (1942); *Gough v. Manning,* 26 Md. 347, 361 (1867); *Teackle v. Gibson,* 8 Md. 70, 84 (1855). With the exception of *Charles County Broadcasting* and *Stuart,* however, each of these cases cited a statute, repealed in 1957, that specifically provided that the question of equity jurisdiction could not be raised for the first time on appeal. *See* Code 1951, art. 5, § 41 ("No defendant to a suit in equity in which an appeal may be taken shall make any objections to the jurisdiction of the court below, unless it shall appear by the record that such objection was made in said court."). In *Moore v. McAllister,* 216 Md. 497, 509, 141 A.2d 176 (1958), the Court stated: "Maryland has adopted the theory that equity jurisdiction does not relate to the *power* of the chancellor." (Emphasis in original.)

■ In a similar vein, it has also been held that a claim may not be raised for the first time on appeal that a jury decided a matter that was within the exclusive "province" of the trial judge. Thus, a party cannot object for the first time on appeal that the trial court erroneously submitted a question of law to the jury, *see Cushwa v. Williamsport*, 117 Md. 306, 314, 83 A. 389 (1912), or that a jury was improperly permitted to construe a contract, *see Baltimore Luggage Co. v. Ligon*, 208 Md. 406, 413, 118 A.2d 665 (1955).

The case most supportive of Hartlove's position is *Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982), cited by this Court in *Mattingly*. There, the plaintiffs filed an action in the Superior Court for Baltimore City for rescission of a contract. At that time, the Maryland Constitution provided that the Superior Court for Baltimore City was vested only with the power to adjudicate actions at law, while the Circuit Court for Baltimore City had the exclusive authority to hear and determine suits in equity. *Creamer*, 294 Md. at 113, 448 A.2d 332. The Court of Appeals vacated an order of rescission issued by the Superior Court. It reasoned that, because "the authority of a court to rescind or cancel a contract is purely equitable," the Superior Court "was clearly without the power to order rescission." *Id.*, 294 Md. at 114, 448 A.2d 332.

*Creamer* involved two *separate courts,* each of which had different, constitutionally enumerated powers. The plaintiffs' action in *Creamer* was clearly filed in the wrong court. As we recognized in *Mattingly, Creamer* did not involve a circuit court after the merger of law and equity, and it did not involve an equitable claim improperly submitted to a jury.

After consideration of the relevant authorities, we conclude that, even if the issue is equitable in nature, the submission of the claim to the jury does not amount to a "jurisdictional" defect, so as to allow Hartlove to raise the issue for the first time on appeal. Hartlove does not challenge the power of the *court, i.e.,* the Circuit Court for Baltimore County, to render a final decree. Instead, his challenge relates to the proper division of labor between two actors within the court: the trial

judge and the jury. As such, the claim does not constitute an issue of subject matter jurisdiction. Therefore, appellant has waived the argument that the School's breach of fiduciary duty claim constitutes an equitable matter that should not have been submitted to the jury.

### The School's Cross–Appeal

The School challenges the trial court's jury instructions. "A party is entitled to have his or her theory of the case presented to the jury, provided that the theory is legally and factually supported." *Shapiro v. Massengill,* 105 Md.App. 743, 761, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995). Thus, the trial court must give a party's requested jury instruction if the instruction (1) is a correct exposition of the law; (2) that law is applicable in light of the evidence before the jury; and (3) the substance of the requested instruction is not fairly covered by the instructions actually given. *Wegad v. Howard Street Jewelers,* 326 Md. 409, 414, 605 A.2d 123 (1992); *Mallard v. Earl,* 106 Md.App. 449, 469, 665 A.2d 287 (1995); *Simmons v. Urquhart,* 106 Md.App. 77, 91, 664 A.2d 27 (1995), *cert. denied,* 341 Md. 174, 669 A.2d 1361 (1996); Md. Rule 2–520(c).

When reviewing the propriety of the court's denial of a requested instruction, we must determine whether the requested instruction satisfied each of those three criteria. *Holman v. Kelly Catering, Inc.,* 334 Md. 480, 495–96, 639 A.2d 701 (1994); *E.G. Rock, Inc. v. Danly,* 98 Md.App. 411, 420–21, 633 A.2d 485 (1993). When reviewing the propriety of the *giving* of a particular instruction, we must determine whether the instruction "fairly and accurately set forth the law applicable to the case" and was "supported by testimony or evidence presented during the case." *Odenton Development Co. v. Lamy,* 320 Md. 33, 43, 575 A.2d 1235 (1990).

### I.

The School's first challenge involves the following portion of the court's instruction on conversion:

A conversion takes place when a person, who rightfully obtains possession of personal property of another's [sic], uses or disposes of the property in an unauthorized manner or when a person, without authority or permission, intentionally deprives another of possession of personal property. Here, the Plaintiff claims that the Defendant converted the funds in the bank accounts at Maryland National Bank, Loyola Federal Savings Bank and First Union Bank of Florida, depriving the estate of Claude Faye Bass and ultimately the Plaintiff of those funds.

In order to find for the Plaintiff on the theory of conversion, you must find that the Plaintiff has proved [sic] by a preponderance of the evidence that the Defendant deprived Mrs. Bass or her estate of personal property belonging to her or it, intentionally and deliberately, without authority or permission of Mrs. Bass, that Mrs. Bass or her estate had actual possession or right to the possession of such property, and finally, that the Defendant failed, refused, or neglected to return the property.

If you find that possession by the Defendant of the property was initially lawful, for example, if you find that it was the subject of a gift from Mrs. Bass, then in addition to the other elements, you must also find that the lawful possession was thereafter revoked and that the Defendant was notified that the right to possession on his part was withdrawn.

**You may wish to consider whether or not Mrs. Bass made a gift of funds to the Defendant.** For a gift to be valid, the donor must intend to transfer the property, must actually deliver the gift, and the donee must accept delivery. The burden is on the person receiving a purported gift to establish every element of the gift by clear and convincing evidence.

(Emphasis supplied.) The School timely objected to the portion of the instruction that we have highlighted and requested that the court instruct the jury that it "must" consider whether Ms. Bass made a gift of the funds to Hartlove. Its counsel stated to the trial judge: "The grounds for this exception are

that the gift issue is the essence of the case. By saying you may wish to consider, what if they don't consider it? Where does that leave this case?" The court declined to change the instruction, however.

The School argues that the jury instruction's permissive "may wish to consider" language was misleading and constitutes reversible error, because "the only real dispute" in this case "was whether Mrs. Bass had made gifts to Defendant of the Bank Accounts during her lifetime or whether the Bank Accounts were instead either convenience accounts or gifts *causa mortis.*" It adds that the "only" way in which appellant would be entitled to the bank accounts would be if Bass had made gifts of the accounts to him during her life and that, therefore, the permissive "may wish to consider" language "could easily have left the jury with the mistaken view that, even if gifts were not made by Mrs. Bass during her lifetime, Defendant would still be entitled to funds in the Bank Accounts at the time of her death."

In support of its view, the School relies on *Whalen v. Milholland,* 89 Md. 199, 43 A. 45 (1899) (*Milholland I* ), a seminal decision in Maryland on the disposition of multiple party bank accounts. There, the Court considered a savings account titled as "Elizabeth O'Neill and Mary Whalen. Joint owners. Payable to the order of either or the survivor." *See id.,* 89 Md. at 200, 43 A. 45. Elizabeth O'Neill had opened and exclusively funded the account, and she kept possession of the account "passbook," which was needed to withdraw money from the account, during her lifetime. After O'Neill died, both Whalen and the executor of O'Neill's estate claimed the money. The Court stated that, in order to prevail, Whalen needed to prove that she was the recipient of a valid gift from her sister. *Id.,* 89 Md. at 201, 43 A. 45. It specifically added that the words "joint owners" on the titling document did not establish a gift, because O'Neill had retained dominion and control over the money by virtue of her power of withdrawal. *Id.,* 89 Md. at 202–03, 43 A. 45. After reviewing the facts, the Court held that Whalen had failed to prove a valid and

effective gift, and that the money therefore belonged to the estate. *Id.*, 89 Md. at 210–11, 43 A. 45.

As at least three of the joint accounts here were unambiguously titled as a "joint tenancy with the right of survivorship" and lacked "trust" language, the School argues that the accounts in issue were *"Milholland I* accounts." Therefore, it claims that Hartlove was *required* to prove that he was the recipient of a gift in order to be entitled to the funds.

 The School further contends that the companion case of *Milholland v. Whalen,* 89 Md. 212, 43 A. 43 (1899) (*Milholland II*), does not apply here. In *Milholland II,* the Court held that Mary Whalen was entitled to the funds remaining in a different savings account that she had owned with O'Neill. The passbook of that account contained an entry that stated: "Metropolitan Savings Bank, in account with Miss Elizabeth O'Neill. *In trust for herself and Mrs. Mary Whalen,* widow, joint owners, subject to the order of either; the balance at the death of either to belong to the survivor." *Id.*, 89 Md. at 213, 43 A. 43 (emphasis supplied). The Court concluded that Ms. Whalen, rather than the estate, was entitled to the money as the beneficiary of the trust, without the necessity of showing a gift. *Id.*, 89 Md. at 218, 43 A. 43.[16] "[A]bsent proof of fraud,

---

**16.** In 1992, the General Assembly enacted the Multiple Party Accounts Statute, codified at § 1–204 of the Financial Institutions Article and § 1–401 of the Estates and Trusts Article, which changed substantially the law on the disposition of multiple party bank accounts. The Act specifically provided that it was "intended to alter the common law, including *Whalen v. Milholland,* 89 Md. 199, 43 A. 45 (1899), and *Milholland v. Whalen,* 89 Md. 212, 43 A. 43 (1899), and their progeny." 1992 Md. Laws, ch. 578, § 2. Section 1–204(d)(1) of the Financial Institutions Article now provides that, upon the death of a party to a multiple party account, "the right to any funds in the account shall be determined in accordance with the express terms of the account agreement." Section 1–204(d)(2) of the Financial Institutions Article provides that, if there is no account agreement or the agreement does not provide a mode of distribution in the event of the death of one of the parties, then the funds in the account "shall belong to the surviving party or parties." The new law, therefore, "releases courts from the gift and trust tests for determining where funds should go." DECEDENTS' ESTATES IN MARYLAND, *supra,* § 7–20(c) at 336.

abuse of a confidential relationship, or other evidence tending to rebut the presumption that a valid trust exists, the beneficiary of such a trust becomes the sole owner of the account upon the death of the other account holder." *Cooper v. Bikle,* 334 Md. 608, 625–26, 640 A.2d 1120 (1994).

We disagree with the School. First, it is not at all clear that *Milholland I* governs joint bank accounts of the type involved here. Court of Appeals decisions decided subsequent to *Milholland I* and *Milholland II* have substantially "blended" the distinction between the types of accounts discussed in those cases, and suggest that the surviving owner of a joint account may have survivorship rights upon the death of the depositor, even in the absence of "trust" language on the titling document. *See Arbaugh v. Hook,* 254 Md. 146, 148, 150–51, 254 A.2d 187 (1969) (checking account titled as *A* and *B,* "joint owners, subject to the order of either, the balance at the death of either, to belong to the survivor" held to be a trust account and to create a rebuttable presumption of survivorship); *Kuhl v. Reese,* 220 Md. 459, 460, 154 A.2d 712 (1959) (account titled as *A* and *B,* "joint owners, subject to the order of either, the balance at death of either to belong to the survivor" viewed as a sufficient "declaration of trust"). *Cf. Blair v. Haas,* 215 Md. 105, 115, 137 A.2d 145 (1957) (entry on signature card creates rebuttable presumption of trust if entry is "in substantially the trust form"). Other cases, however, have, in some measure, maintained the distinction between the types of accounts. *See Shaffer v. Lohr,* 264 Md. 397, 287 A.2d 42 (1972) (account titled as "*A* or *B,* either or the survivor," held not to be in the trust form); *Barker v. Aiello,* 84 Md.App. 629, 634, 581 A.2d 462 (1990), *cert. denied,* 322 Md. 130, 586

The Act does not apply to the case before us, however. Mrs. Bass died in 1992, and it applies only (1) to accounts created on or after October 1, 1993, or (2) accounts created before October 1, 1993 if (a) the parties expressly agree or (b) the depository institution sends a proper notice to the account holders and the account holders acquiesce in the change. Maryland Code, § 1–204(c) of the Financial Institutions Article (1980, Supp.1995).

A.2d 13 (1991) ("Maryland distinguishes between joint bank accounts and joint trust accounts.").

Recently, in *Cooper v. Bikle, supra*, 334 Md. 608, 640 A.2d 1120, which the parties did not cite, the Court of Appeals suggested that accounts owned in a "joint tenancy with the right of survivorship" are not governed by the *Milholland I/Milholland II* line of cases, at least in the context of conversion claims like the one at issue here. *Cooper* indicates that, when one of the joint owners of the account dies, the funds simply pass to the survivor under the elementary principle of property law that property owned in a joint tenancy with the right of survivorship automatically passes to the surviving owner or owners upon the death of one of the joint tenants.

*Cooper* involved a suit by the personal representatives of the estate of Helen Bikle against Josef Bikle. The plaintiffs alleged that Josef and his late brother, Austin, had fraudulently converted more than $70,000 from a bank account that Austin and Helen Bikle had owned as "joint tenants with the right of survivorship." Austin, who was Helen's husband, predeceased her.[17]

The circuit court dismissed the case, ruling that the plaintiffs had failed to join the estate of Austin Bikle as a necessary party. The Court of Appeals reversed. Among the issues that it addressed was whether "disposition of the action [would] impair or impede [the estate's] ability to protect a claimed interest relating to the subject of the action." *See* Md. Rule 2–211(a)(2). There was some confusion from the parties' submissions as to whether Helen and Austin's joint account had been held in a "joint tenancy with the right of survivorship" or was instead a joint trust account of the *Milholland II* variety. *See Cooper*, 334 Md. at 624–25, 640 A.2d 1120. The Court thus analyzed the issue from both perspectives.

---

**17.** This account was not subject to the Multiple Party Accounts Statute.

The Court determined that, if the account were held in a joint tenancy, then Austin's estate had no interest that could be impaired by disposition of the action because, as a joint tenant, his interest in the account was extinguished upon his death.

The funds at issue in this case were allegedly deposited into a bank account held by Austin and Josef Bikle as joint tenants with a right of survivorship. Preliminarily, we must recognize the rudimentary property law principle that if property is held by joint tenants and one of the tenants dies, that individual's interest in the property is **immediately extinguished.** The surviving joint tenant becomes the **sole owner** of the property pursuant to the right of survivorship and without the necessity of probate.

\* \* \* \* \* \*

In the instant case, therefore, since Helen Bikle possessed a right of survivorship in the original joint accounts and her husband predeceased her, she would have become the sole owner of the funds had they not been allegedly converted. Consequently, the funds in those original joint accounts would have become a part of Helen Bikle's estate upon her death. As a result, Helen Bikle's estate possesses the sole interest in any recovery of funds fraudulently converted from those accounts and deposited into the joint account of Austin and Josef Bikle. On the other hand, the Estate of Austin H. Bikle retains no interest in the funds **because any interest Austin Bikle possessed during his life would have been extinguished upon his death.**

*Id.,* 334 Md. at 621, 623–24, 640 A.2d 1120 (emphasis supplied).

The Court's analysis shows that the surviving joint tenant's right to the funds is automatic and immediate; it never suggested that there needed to be a "tracing" of who had deposited what funds in the account and an analysis of whether a perfected gift had taken place. To the contrary, the Court stated that a deceased joint tenant's interest in a bank is "extinguished" upon his death.

Next, the Court determined that Austin Bikle's estate also would have no interest in the contested funds if the accounts were titled in the trust form. *Id.*, 334 Md. at 625–26, 640 A.2d 1120. It then concluded:

Alternatively, even if the accounts were not held in trust, but simply jointly owned by Helen and Austin Bikle, then Austin Bikle's estate never possessed any interest in the account due to Helen Bikle's acknowledged right of survivorship.

Under **either** the trust theory or the joint tenancy theory, Austin Bikle's interest in the accounts was **extinguished** upon his death, and disposition of this case will have no effect upon the property rights of his estate.

*Id.*, 334 Md. at 626, 640 A.2d 1120 (emphasis supplied). The Court thus viewed joint tenancy theory and trust theory as separate and independent means by which Austin's interest in the joint accounts would pass to Helen upon his death. The law of gifts played no role in the discussion.

 The import of *Cooper* is clear. It is undisputed that the bank accounts here were owned in a joint tenancy with the right of survivorship. Thus, under what the *Cooper* Court called a "rudimentary property law principle," upon Ms. Bass's death, the funds in the accounts passed to Hartlove as the surviving joint tenant. Based on *Cooper*, the School is incorrect in its assertion that the *only* way in which appellant could prevail on the conversion and unjust enrichment counts would be if the accounts were in "trust form" or if Ms. Bass made a "gift" of the accounts.[18] Therefore, the circuit court

---

18. In cases involving "trust" accounts, it is settled that when, as here, the decedent and the surviving account holder were in a confidential relationship, the burden shifts to the survivor to prove the following elements in order to receive the money: (1) the decedent had donative intent; (2) the decedent understood the nature of the transaction; (3) the decedent's act was deliberate, voluntary, and free from undue influence; and (4) the transaction was fair and reasonable in all respects. *Tribull v. Tribull*, 208 Md. 490, 507, 119 A.2d 399 (1956); *Hancock v. Savings Bank of Baltimore*, 199 Md. 163, 171, 85 A.2d 770 (1952); *Coburn v. Shilling*, 138 Md. 177, 199, 113 A. 761 (1921); *Boehm v. Harrington*, 54 Md.App. 345, 351, 458 A.2d 885 (1983);

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

did not err in declining to instruct the jury that it "must" consider whether Ms. Bass had made a gift of the funds in the bank accounts to appellant.

▉▉▉▉ We acknowledge that, notwithstanding the signature card for a joint account, a decedent's estate may prove that a joint tenancy was not intended to be created, as in the case of a "convenience" account. *See Haller v. White,* 228 Md. 505, 510, 180 A.2d 689 (1962). This is the rule followed by other jurisdictions. *See, e.g., Franklin v. Anna National Bank of Anna,* 140 Ill.App.3d 533, 94 Ill.Dec. 870, 488 N.E.2d 1117 (1986). But, under the authorities that we have discussed, appellant was not required to establish a gift in order to prevail on the conversion and unjust enrichment claims.

▉▉▉▉ In any event, even if we believed that *Milholland I* controlled this case, we would hold that the three simple words "may wish to" in a much larger jury instruction do not rise to the level of reversible error. The "trial judge is permitted wide discretion as to the form of jury instructions." *Blaw–Knox Construction Equipment Co. v. Morris,* 88 Md. App. 655, 666–67, 596 A.2d 679 (1991). "The purpose of oral charges is to tell the jury in simple words what the law is in the case before them, and we will not be too particular in criticizing the words used if the result be sufficient." *Hartman v. Meadows,* 243 Md. 158, 163, 220 A.2d 555 (1966); *West v. Belle Isle Cab Co.,* 203 Md. 244, 250–51, 100 A.2d 17 (1953). Thus, if the instructions constitute a clear and accurate expression of the applicable law, "we will not reverse merely because of a failure in form." *Shapiro v. Massengill, supra,* 105 Md.App. at 761, 661 A.2d 202. *See also Wilhelm v. State Traffic Safety Commission,* 230 Md. 91, 102, 185 A.2d 715 (1962).

---

*Midler v. Shapiro,* 33 Md.App. 264, 270, 364 A.2d 99 (1976). A gift contains three elements: intent, delivery, *and* acceptance. *Dorsey v. Dorsey,* 302 Md. 312, 318, 487 A.2d 1181 (1985). We observe that the "donative intent" element in the rule applicable to confidential relationships only corresponds to one of the gift elements.

In this case, the likelihood that the jury was confused or misled by the use of "may" instead of "must" was slim. The jury was advised of the elements of a gift and the law on conversion. The jury thus knew of the presence of these issues in the case. In addition, if, as the School contended to the trial judge, the gift issue really were "the essence of the case," nothing prevented the School from arguing the issue to the jury. As the Court of Appeals stated in *Dover Elevator Co. v. Swann,* 334 Md. 231, 258–59, 638 A.2d 762 (1994): "A number of Maryland cases . . . assert the proposition that specifically requested jury instructions are unnecessary where the instructions given adequately encompass the field of law and a party's counsel has room to argue applicable law in light of the facts of the case." Given these factors, the trial court's use of "may wish to" rather than "must" does not warrant a new trial. *See Montauk Corp. v. Seeds,* 215 Md. 491, 498–500, 138 A.2d 907 (1958) (although "frustration of purpose" instruction was "inaptly phrased" and perhaps not as complete as was desirable, Court could not determine whether the jury was so misled or confused as to render it reversible error).

## II.

 The School's next challenge to the jury instructions contains two parts. One part alleges what the School calls an "error of commission," and the second part alleges what it calls an "error of omission." Both contentions are related, and we shall consider each one in turn.

The claimed "error of commission" refers to the following instruction:

In the case of a gift of a bank account, the gift must be such that the donee has the ability to withdraw all of the funds from the account at any time, whether it is by way of pass book *or by language within the titling document* which permits either party, donor or donee, to withdraw funds at any time.

(Emphasis supplied.) The School asserts that the instruction improperly told the jury that it could find a gift by virtue of the language in the signature cards alone.

The record reveals, however, that the School never objected to the instruction. Accordingly, any challenge to it is waived. *See* Md. Rules 2–520(e); 8–131(a). Instead, the only pertinent objection that the School made involved its claimed error of *omission*—that the court failed to add an additional instruction to tell the jury affirmatively that it could not find a gift from the language of the signature cards alone. The School's counsel stated to the court:

> [T]he next exception is that the Court did not . . . instruct to the effect that they cannot rely on the signature cards alone for purposes of determining a gift or determining title but must have independent evidence. The reason for this is, with regard to Maryland National Bank, there are no title cards or signature cards, and with the other two, they do not discuss in the trust language—by using this language, there is a presumption of gift, but without the trust language, which does not occur anywhere, it's an affirmative obligation to prove that the gift occurred, and you cannot rely on the signature cards alone.

The short answer to this challenge lies in our discussion in part I. Contrary to what the School's counsel asserted to the trial judge, the "joint tenancy with the right of survivorship" language in the signature cards *did* provide a means for the jury to "determin[e] title" to the bank accounts.

Moreover, the School's requested jury instruction was not warranted by the evidence. As we noted earlier, one of the Loyola signature cards stated, in part: "It is agreed by the signatory parties with each other and by the parties with you that any funds placed in or added to the account by any one of the parties *are and shall be conclusively presumed to be a gift and delivery* at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account." (Italics in original.) Perhaps the School could have gone beyond the four corners of the signature card

to show, by extrinsic evidence, that Bass lacked either the intent to make a gift or to deliver the gift by intending to transfer a present, irrevocable interest in the deposited funds with respect to Hartlove's one-half "pro rata interest in the account." *See In re Schneider's Estate,* 6 Ill.2d 180, 127 N.E.2d 445, 449 (1955) (in dispute between surviving joint tenant of bank account and decedent's estate, form of deposit agreement "is not conclusive as to the intention of the depositors between themselves."). But the School's proposed instruction, that would have completely foreclosed use of the signature cards to establish a gift, was not warranted in light of the evidence.

We conclude that the School's requested instruction was fairly covered by the instructions actually given. The court correctly instructed the jury on the elements of a gift. This instruction was broad enough to allow the School to argue to the jury that the language of the signature cards was insufficient to show a gift. *See Dover Elevator Co. v. Swann,* 334 Md. at 258–59, 638 A.2d 762. In light of the instructions to the jury as a whole, the School's specific instruction was not needed.

## III.

Finally, the School contends that the trial court erred in failing to instruct the jury on the definition of "clear and convincing evidence," as that is the standard by which the donee of an alleged gift must prove the gift. *See Dorsey v. Dorsey,* 302 Md. 312, 318, 487 A.2d 1181 (1985). The School cites the following exchange during the objections to the jury instructions:

[THE SCHOOL'S COUNSEL]: The next thing is, you properly noted that the burden is on the person receiving the purported gift to establish every element of the gift by clear and convincing evidence. However, you did not define for the jury that clear and convincing evidence is a greater burden than preponderance of the evidence, and I would request that the Court go on and explain the difference.

I really think this case stands or falls on the gift issue, and so I would request that the Court give an instruction on what clear and convincing evidence is.

THE COURT: Do you have one handy, Mr. Worrall [the School's counsel]?

[THE SCHOOL'S COUNSEL]: I was going to say, I'm not sure any of us knows what clear and convincing is.

THE COURT: That's precisely the point.

[THE SCHOOL'S COUNSEL]: *But the point I would make is it's something more than a preponderance of the evidence and something less than beyond a reasonable doubt.*

THE COURT: I suspect you can argue that within the context of the instructions.

(Emphasis supplied.)

The School asserts that the court erred in failing to instruct the jury that "clear and convincing evidence" means "something more than a preponderance of the evidence and something less than beyond a reasonable doubt." It argues that "clear and convincing evidence" is a "nebulous phrase" that the jury probably could not understand. It also asserts that, because the court did instruct the jury on the definition of "preponderance of the evidence," "the jury may have thought that 'clear and convincing evidence' was merely the same as 'preponderance of the evidence' or may have even thought that 'clear and convincing evidence' was a degree of proof lower than 'preponderance of the evidence.'"

Because of our doubt that this case "stands or falls on the gift issue," *see* part I, *supra,* the issue involving the School's requested instruction is of much less import. In addition, even if the definition of "clear and convincing evidence" that the School offered was technically correct, *see Vogel v. State,* 315 Md. 458, 470, 554 A.2d 1231 (1989); *Berkey v. Delia,* 287 Md. 302, 319–20, 413 A.2d 170 (1980), and the court should have told the jury that "clear and convincing evidence" was a higher standard of proof than "preponderance of the evidence," it would not have offered the jury anything more

meaningful than what it already had. The reason is that the definition would have introduced a new undefined term, "beyond a reasonable doubt." A party cannot expect a judge to define one legal term of art by reference to a different, undefined legal term of art. This is particularly true in a case such as this, when the School's counsel told the trial judge that he was not sure of what "clear and convincing evidence" meant.

■■■ In *Simco Sales Service of Maryland, Inc. v. Schweigman*, 237 Md. 180, 187, 205 A.2d 245 (1964), the Court held that a trial court's failure to define the term "proximate cause," even if erroneous, was harmless error, as the court had carefully instructed the jury on the "Boulevard Rule," and had made it clear that a violation of that rule by the unfavored driver needed to be the proximate cause of the accident. The same principle applies here. "Generally, the giving of an erroneous instruction to the jury, not injurious or prejudicial to the party complaining, is harmless and not a ground for reversal. It must appear not only that the instruction was erroneous, but that the complaining party was prejudiced thereby." 2 Maryland Law Encyclopedia *Appeals* § 484 at 397 (1960).

We conclude that any error by the trial court, assuming that one occurred, was harmless. *See Montauk Corp. v. Seeds, supra,* 215 Md. at 498–500, 138 A.2d 907; *Singleton v. Roman,* 195 Md. 241, 248–49, 72 A.2d 705 (1950) (refusal to give instruction that was applicable to the issues and not covered by other instructions is a ground for reversal "if the error in refusing the instruction was material and prejudiced the complaining party"); *Beghtol v. Michael,* 80 Md.App. 387, 403–04, 564 A.2d 82 (1989), *cert. denied,* 318 Md. 514, 569 A.2d 643 (1990) (failure to instruct jury to disregard feelings of prejudice or sympathy was harmless error because it did not prejudice the verdict, as evidenced by the jury's refusal to award punitive damages).

**JUDGMENTS AFFIRMED.**

COSTS TO BE EQUALLY DIVIDED BETWEEN THE PARTIES.

CATHELL, J., dissents.

CATHELL, Judge, dissenting.

I respectfully disagree with and dissent to the majority's creation of a new tortious cause of action for breach of fiduciary duty. The Court of Appeals has had, on two recent occasions, *Adams* and *Alleco*, opportunities in which it could have recognized breach of fiduciary duty as a distinct cause of action, had it so chosen. Both times, it declined. When a higher court with opportunity to do so, though not rejecting it outright, nevertheless declines to adopt such a new cause of action, I believe it is generally unwise for this Court to do so. It is one thing to lead from below when the Court above has had no opportunity to lead. It is another thing to lead from below when the Court above has chosen not to.

The majority reasons that because the Court of Appeals did not reject the tort "we should not do so either." The majority fails to distinguish that in *Alleco* and *Adams* the Court of Appeals maintained the status quo; the majority in the case *sub judice* changes it. Such changes, in my view, are, as we said in our *Alleco, infra*, for "the Legislature ... or the Court of Appeals."

Unlike the situation in which a breach of fiduciary duty is an element of a fraud or deceit or similar cause of action, when constituted as a separate, independent cause of action, the *entire* burden of production will, under traditional breach of fiduciary duty standards, almost immediately shift to the defendant in most instances. *See Hale v. Hale,* 74 Md.App. 555, 567, 539 A.2d 247, *cert. denied,* 313 Md. 30, 542 A.2d 857 (1988). As the trial judge below instructed, if a fiduciary duty exists a defendant must produce evidence that he has not breached it. He must establish non-breach by clear and convincing evidence. "Once ... shown, a presumption arises ... that the transaction complained of resulted from fraud.... This presumption shifts the burden to the defen-

dant to show the fairness and reasonableness of the transaction. The defendant's evidence must be clear . . . and convincing to overcome the presumption." *Wimmer v. Wimmer*, 287 Md. 663, 669, 414 A.2d 1254 (1980) (citations omitted).

In a traditional fraud or deceit case, while a defendant may be required to produce evidence of proper conduct in the performance of his duty, the overall burden to produce evidence of fraud or deceit ultimately rests upon the plaintiff, *i.e.*, she or he must establish fraud or deceit by clear and convincing evidence. The majority is silent on the ultimate burden of proof in the instant case. Who has it? What is it?[1] The Court of Appeals in *Adams* (an action for an accounting between partners) is quoted by the majority in the case *sub judice* as saying, "[B]ut we [the Court of Appeals] have not opined on the existence of the tort or torts, *or on its or their elements or rules of damages* . . . . We need not so opine in this case."[2] Yet, the majority in the case *sub judice*, unlike the Court of Appeals in *Adams* creates the tort and, thus, should address those matters. The majority, however, fails to make any mention of the elements, burden of production, burden of proof, or on any rule of damages. In effect, the majority says, "It's here," but leaves to the trial courts the problems of figuring out what "it" is.

Furthermore, the majority, by adopting such a cause of action as an independent tort, may well open a broad range of

---

**1.** While, in some fraud and deceit cases, the issue of fiduciary duty may be the only basis for the suit, in others it is but one of several allegedly causative factors. If breach of fiduciary duty is a separate cause of action, may it still be pled as an element of fraud or deceit or must it be stated as a separate cause of action? For example, in the instant case, it was pled both as a separate cause of action and also as an element of several other causes of action—all based on the same conduct. If pled as an element of fraud in one action and a judgment is rendered, may it later be pled as a separate cause of action or would *res judicata*, issue preclusion, or similar defenses be available?

**2.** The *Adams* Court later stated, "To the extent that Adams's argument is that a breach of fiduciary duty in and of itself permits the award of punitive damages, we reject his contention under the policy guidelines for punitive damages in general." *Adams v. Coates*, 331 Md. 1, 13, 626 A.2d 36 (1993).

applicability. While the majority writes only in this case, it nevertheless opens the door to a separate cause of action for every factual situation in which a fiduciary, *i.e.,* confidential, relationship exists. This is not a small concern.

Confidential relationships are generally included in the compass of fiduciary relationships. These relationships exist between client and attorney (as in *Alleco*), principal and agent, principal and surety, sometimes in landlord-tenant relationships, parent and child, guardian and ward, ancestor and heir, husband and wife, trustee and *cestui que trust,* personal representatives and creditors, legatees, and distributees, appointor and appointee under powers, accountants or other financial managers and their clients and partners (as in *Adams*) and part owners—every case in which there is a confidence reposed by one in another and in which the dominion and influence resulting from that confidence is exercised by one person over the other. *See Black's Law Dictionary* 298 (6th ed.1990). *Black's* defines "Fiduciary relation" as follows:

> **Fiduciary** *or* **confidential relation.** A very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one person trusts in or relies upon another.... [T]he relation can be ... domestic....

*Id.* at 626; *see also* 37 Am.Jur.2d *Fraud and Deceit* § 16 (1968).

In respect to marital situations, it is often argued and established that a particular marriage relationship is a confidential relationship. *See, e.g., Hale v. Hale,* 74 Md.App. at 564, 539 A.2d 247; *Jorgensen v. Jorgensen,* 32 Cal.2d 13, 193 P.2d 728 (1948). It is not unusual for a husband (or wife) who brings property into a marriage to create tenancy by the entireties in it or to convey it outright to the other spouse. Upon a divorce, or even before or after, that husband (or wife), because of the majority's opinion, can now file a separate cause of action for breach of fiduciary duty, ask for a jury trial, establish the marriage, and thus the confidential relation-

ship, and the burden of production would then shift to the wife (or husband) to prove that she (or he) did not abuse the confidential relationship. Thus, wives (or husbands) receiving property as gifts from the other spouse during marriage, after the termination of the divorce and marital property proceedings, could still be required to produce evidence that they did not take advantage of the other. They will be forever defending. *See, e.g., Jorgensen,* 193 P.2d at 733 ("The concealment of community property assets by the husband from the wife in connection with such [a property settlement] agreement is therefore a breach of fiduciary duty[3] of the husband that deprives the wife of an opportunity to protect her rights in the concealed assets and thus warrants equitable relief from a judgment approving such agreement."); *In re Marriage of Modnick,* 33 Cal.3d 897, 191 Cal.Rptr. 629, 633, 663 P.2d 187, 191 (1983) (following *Jorgensen* and finding that the fiduciary relationship between spouses does not terminate with their separation; rather, it continues until the marriage has been dissolved and the property divided).

I perceive that the creation of this tort as a separate cause of action might occasion an interesting interaction with the Marital Property Act. If one spouse makes a gift of property (other than realty as tenants by the entirety) to the other spouse, the property so given is not marital property. No adjustments would be made as to it under the Marital Property Act during the divorce. After the divorce, however, the donor spouse could institute an action based on this new tort and use the former marriage itself to prove the existence of the confidential relationship at the time of the gift. The recipient would then have the burden of production to establish *to a jury* that he or she did not abuse the marital

---

**3.** The duty in *Jorgensen* arose by virtue of the husband's status "[a]s the manager of the community [—*i.e.,* marital—] property." 193 P.2d at 733. Not surprisingly, today, that duty extends to both parties, and "stems in part from the confidential nature of the marital relationship ... [and] from the fiduciary relationship that exists between spouses." *In re Marriage of Modnick,* 33 Cal.3d 897, 191 Cal.Rptr. 629, 633, 663 P.2d 187, 191 (1983).

relationship in obtaining the gift—the car, the business, the fur, the diamond, the stock, etc.

The majority states that to require persons to fit a claim for breach of fiduciary duty into recognized causes of action would result in a "form over substance rule." The plaintiff's complaint in the case *sub judice* is extensive. It contains in its 62 pages, 12 separate counts (including the one at issue). It contains 84 separate allegation paragraphs and 168 separate claims for damages or other relief (6 allegation paragraphs and 14 claim paragraphs were contained in the count at issue). When a litigant cannot fit the alleged wrong into such an extensive pleading, to say that "form over substance" results goes far beyond my understanding of the phrase. In essence, what the trial court did, and the majority here does, is to give to appellee a victory it could not win under theretofore extant causes of action.

The majority notes that because the appellee lost on all of the eleven other counts the fact that the breach of fiduciary count "was the only claim on which it prevailed" somehow rebuts the proposition that "adequate remedies already exist." In my view that is a pure sophism. Under that view the majority could create new causes of action for every plaintiff that loses under traditional causes of action—*ad infinitum.* I would suggest that our adversarial system contemplates that on occasion litigants lose.

The function of an appellate court, in my view, should not, considering the nature of our adversarial system, include creating a new cause of action in order to help one side in a legal dispute that is unable to establish that it is otherwise entitled to an existing remedy. As I perceive our role, it does not extend to creating remedies when fully adequate remedies already exist. The trial court, and the majority, have tried appellee's case better than did appellee.

In the long history of the utilization of breaches of fiduciary duty within other causes of action, no such "form over substance" rule has resulted. Instead, it is first created by the majority in this case, and then utilized by it to justify, in part,

the creation of a new cause of action. Moreover, there is no indication anywhere in the Maryland cases, of which I am aware, that litigants have had any difficulty whatsoever in having their breach of fiduciary concerns fully addressed within the applicable traditional causes of action.

I perceive that breach of fiduciary duty is particularly unsuited to be an independent tortious cause of action. Including such breaches as relevant elements in the broader scope of fraud and deceit actions or in actions for accountings, etc., has, over time, sufficed. In the instant case, the traditional causes of action, such as fraud, conversion, and unjust enrichment, etc., were pled. The breach of fiduciary duty that served as the foundation for the count that went to the jury was also included in one or more, if not all, of those other counts. What the majority does is to reward the plaintiffs below, who failed to prevail in the traditional causes of action, by recognizing this new tort that was alleged in a separate count. No particular difficulty has been espoused (in the instant case or any other that I am aware of) in having a breach of fiduciary duty as a constituent part of these traditional torts. In other words, the current practice is not broken; it works and does not need to be fixed by this Court, gratuitously.

Moreover, the instant case involved only one alleged course of conduct involving the breach or breaches of fiduciary relationships. There were, in addition to the breach of fiduciary duty counts (Counts I, II), counts for actual Fraud (Counts VII, VIII), Conversion (Counts III, IV), Negligent Misrepresentation (Count IX), Unjust Enrichment (Count X), Undue Influence (Count XI), Professional Malpractice (Count XII), Breach of Contract (Count V), and Negligence (Count VI). In Count VII, a specific assertion was made that the defendant "concealed his breaches of his fiduciary duties." In Count XI, a specific assertion was alleged that the defendant committed "breaches of confidential and fiduciary duties." More important, all of the counts incorporated allegations of breaches of fiduciary or confidential relationships.

The trial court granted judgment for the defendant at the close of the plaintiff's case on Counts I, V, VI, VII, VIII, IX, XI, and XII, all of which alleged a breach of fiduciary duty to varying extents. As to the question of whether a breach had in fact occurred, the court stated: "The question of whether or not, as a matter of law or as a matter of equity, a confidential relationship exists or a fiduciary relationship exists, I suppose should await the conclusion of all of the testimony." In other words, the court found that the plaintiff had put forward some evidence that a fiduciary relationship existed and that perhaps a relationship had been breached, and yet the court, at that point, incongruously, dismissed many of the causes of action in which a breach of fiduciary duty can be a determinative element. Under the shifting burden of production, if the court found that the plaintiff had put forward sufficient evidence to make out a *prima facie* case of the existence of a fiduciary duty, then the court should have shifted the burden to the defendant to show that he did not abuse his relationship with the deceased by exerting, for example, undue influence. A fiduciary relationship existed or it did not. A duty was breached, or it was not. The court was wrong either when it directed judgments for the defendant[4] or when it thereafter submitted the same issue to the jury. The result is even more incongruous when it is noted that the jury found for the defendant on the other issues except as to the new independent cause of action then being created (whether he had breached his fiduciary duty in his capacity of personal representative). In other words, the court and the jury found no conversions, no breach of contract, no negligence, no fraud, no negligent misrepresentation, no unjust enrichment, no undue influence, and no professional malpractice, all of which had been alleged and all of which alleged a breach of fiduciary duty. Thus, although the alleged breach of fiduciary duty was not sufficiently proven to support the general or specific allegations of a breach of fiduciary duty as alleged in the other

---

4. It appears that appellee did not appeal the trial court's granting of these judgments. The school's cross appeal related to instructions.

counts, it becomes, by reason of the majority's decision, a new general wrong for which the majority fashions a remedy. Even if a relationship does not exist or a breach does not constitute a fraud, a misrepresentation, undue influence, a conversion, or a misrepresentation, and even if you are not unjustly enriched by it, you can be sued for it and have damages assessed against you. The majority creates a cornucopian supply of fuel for future litigation—in my view, needlessly.

Interestingly, in our *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.,* 99 Md.App. 696, 639 A.2d 173 (1994), *aff'd* 340 Md. 176, 665 A.2d 1038 (1995), we declined to recognize a separate tort of aiding and abetting someone else in the commission of a tort. In that opinion, we stated what I believe to be the correct position for us to take in the instant case: "If that [aiding and abetting another tort] is to be recognized as a new, independent tort, either the Legislature by statute or the Court of Appeals by extending the common law will have to do it. We shall not do it." *Id.* at 701, 639 A.2d 173. That philosophy, which appeared to me to be so admirable in our *Alleco* opinion, is conspicuously absent in the change in appellate posture the majority makes in the case at bar. Moreover, in *Alleco*, we, drawing, in my opinion, upon far more pertinent authority than the majority does here, recognized the tort of civil conspiracy. Reviewing that portion of this Court's position, the Court of Appeals specifically held that our recognition of an independent tort of civil conspiracy was wrong. "The statement by the Court of Special Appeals, that civil conspiracy is recognized in Maryland as an independent tort, is simply incorrect." *Alleco,* 340 Md. at 189, 665 A.2d 1038.

As to this issue, I would reverse and hold that no such independent cause of action for breach of fiduciary duty exists, or ought to exist, in Maryland.

Finally, I do not necessarily agree with portions of the majority's characterization of our opinion in *Hosain v. Malik,* 108 Md.App. 284, 671 A.2d 988 (1996), and its applicability to

the issues here present. However, as any such disagreement would have no bearing on any of the issues raised, I do not expound further.